Leslie L. GRISHAM, Plaintiff,

v.

PHILIP MORRIS, INC.,
et al., Defendants.

No. CV 02–7930 SVW (RCx).

United States District Court,
C.D. California.

Oct. 7, 2009.

Frances M. Phares, Baum Hedlund Aristei Goldman & Menzies, Covington, LA, J. Clark Aristei, Michael L. Baum, Baum Hedlund Aristei Goldman & Menzies, Los Angeles, CA, for Plaintiff.

Dana N. Gwaltney, Frank P. Kelly, III, Ingrid L. Peterson, M. Kevin Underhill, Patrick J. Gregory, Tammy B. Webb, Shook Hardy & Bacon LLP, Peter Nels Larson, Jones Day, J. Leah Castella, Natasha Sen, Bingham McCutchen, San Francisco, CA, Daniel P. Collins, Munger Tolles & Olson LLP, John L. Carlton, Law Office of John L. Carlton, John D. Lombardo, Arnold and Porter, Kevin R. Costello, Ralph A. Campillo, Sedgwick Detert Moran & Arnold, Melanie Ann Hanson Sartoris, AUSA–Office of U.S. Attorney, Los Angeles, CA, Gary Long, Shook Hardy & Bacon LLP, Kansas City, MO, Amanda S. Jacobs, Erin L. Dickinson, Sarah L. Bunce, Stephen Kaczynski, Jones Day, Cleveland, OH, Elizabeth P. Kessler, Kelli Jones Stiles, Jones Day, Columbus, OH, for Defendants.

ORDER (1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE STATUTE OF LIMITATIONS DEFENSE [160]; (2) DENYING PLAINTIFF'S MOTION TO STAY CASE PENDING FINAL OUTCOME OF PER CURIUM OPINION AND REQUEST FOR EXPEDITED HEARING [161]; (3) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [174]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

The factual and procedural background of this case is set out in the Court's previous orders. (*See* October 4, 2007 Order Granting and Partially Denying Defendants' Motion to Strike and Partially Granting Dismissal, docket no. 108; April 1, 2003 Order Granting Judgment on the Pleadings in Part and Dismissing in Part, docket no. 67.) The present motions therefore need relatively little introduction.

Plaintiff's basic assertion is that she smoked Defendants' cigarettes and, as a result, now suffers from periodontal disease[1] and Chronic Obstructive Pulmonary Disease.[2] Specifically, Plaintiff asserts that the chemicals contained in cigarette smoke directly cause these injuries, that Defendants failed to remove or neutralize these harmful chemicals, and that Defendants' conduct has in various other ways caused Plaintiff to smoke more cigarettes than she would have otherwise smoked. By smoking more cigarettes, Plaintiff has been exposed to more of the harmful chemicals that tend to cause periodontal

---

1. Plaintiff's complaint alleges harm including both periodontitis (tooth and bone loss) and gingivitis, which together are known as "periodontal disease." (Defs. UF ¶ 2.)

2. Chronic obstructive pulmonary disease is related to, and sometimes used interchangeably with, emphysema.

disease and Chronic Obstructive Pulmonary Disease. Plaintiff's causes of action include negligence, strict products liability, false representation, deceit/fraudulent concealment, and breach of express warranty. Plaintiff seeks compensatory and punitive damages.

The parties have filed three significant motions that are now before the Court. In the first motion, Defendants seek summary judgment on basis of the statute of limitations. In the second motion, Plaintiff seeks collateral estoppel on the basis of the Department of Justice's case against the tobacco companies. In the third motion, Defendants seek summary judgment in their favor on some of Plaintiff's claims. Specifically, Defendants seek to establish that cigarettes were not a defective product due to a design defect; that cigarettes were not a defective product due to failing to meet consumer expectations; that Restatement (Second) of Torts § 402A (comment i) bars any products liability cause of action; that Plaintiff's fraudulent concealment/deceit cause of action is preempted and is unsupported by evidence; and that Plaintiff's breach of express warranty cause of action is unsupported by evidence.

## II. LEGAL STANDARD GOVERNING SUMMARY JUDGMENT

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1263 (9th Cir.1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That burden may be met by " 'showing'—that is,

pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323–34, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact. *Addisu v. Fred Meyer,* 198 F.3d 1130, 1134 (9th Cir.2000). Only genuine disputes "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party" over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001) (the nonmoving party must identify specific evidence from which a reasonable jury could return a verdict in its favor).

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF STATUTE OF LIMITATIONS

Plaintiff filed her complaint on March 15, 2002. At the time of she filed, the California statute of limitations for personal injury actions was one year. Cal.Code Civ. Proc. § 340(3); *see Maldonado v. Harris,* 370 F.3d 945, 954–55 (9th Cir.2004) (successor statute to Cal.Code Civ. Proc. § 340(3) does not apply retroactively).

Plaintiff's complaint asserts that she was diagnosed with the beginning stages of emphysema (used interchangeably with Chronic Obstructive Pulmonary Disease) on March 28, 2001 (First Amended Compl.

¶ 31) and that she was diagnosed with periodontal disease and gingivitis in April 2001 (First Amended Compl. ¶ 32). As alleged, the injuries clearly fall within the applicable limitations period. *See Grisham v. Philip Morris U.S.A., Inc.,* 40 Cal.4th 623, 639, 54 Cal.Rptr.3d 735, 151 P.3d 1151 (2007).

Following discovery, Defendants filed a motion for summary judgment on the basis of the statute of limitations. Their basic contention is that Plaintiff's pleadings are inconsistent with the facts that she now asserts. Defendants point out that the evidence shows that Plaintiff first started suffering periodontal harm at least as early as 1990, not in April 2001 as asserted in the First Amended Complaint. As for Plaintiff's Chronic Obstructive Pulmonary Disease, Defendants argue that the evidence shows that Plaintiff was not diagnosed with Chronic Obstructive Pulmonary Disease until July 2001, which contradicts Plaintiff's pleaded facts that she was diagnosed in March 2001.

Plaintiff's response is that, even though she was aware that she suffered from periodontal disease, she did not learn of the link between smoking and periodontal disease until March 30, 2002. Accordingly, she asserts that her cause of action did not accrue until she knew that Defendants' conduct was linked to her injuries. This is inconsistent with Plaintiff's First Amended Complaint, which alleges that Plaintiff did not begin to suffer periodontal disease until March 2002. Plaintiff's First Amended Complaint did not allege any facts regarding her delayed discovery of the link between smoking and periodontal disease. However, Plaintiff's First Amended Complaint did allege that Defendants engaged in fraud and concealment to prevent the public from knowing about the health risks of smoking.

Defendants argue that, even if Plaintiff asserts that she was unaware until 2001 that Defendants' conduct caused these injuries, Plaintiff should be barred from introducing evidence to support such assertions because Plaintiff failed to include these arguments in her pleadings. Defendants assert that throughout the time Plaintiff suffered periodontal disease, she was on inquiry notice of her injury's link to cigarette smoking, and her First Amended Complaint bars her from introducing evidence to contradict this claim.

## A. LEGAL STANDARD GOVERNING STATUTE OF LIMITATIONS

### 1. Cause of Action Accrual

A "cause of action accrues at 'the time when the cause of action is complete with all of its elements.'" *Fox v. Ethicon Endo–Surgery, Inc.,* 35 Cal.4th 797, 806–807, 27 Cal.Rptr.3d 661, 110 P.3d 914 (2005). Generally, this means that "an action accrues on the date of injury," provided that the injured party "suspects ... that someone has done something wrong" that would cause the injury. *Jolly v. Eli Lilly & Co.,* 44 Cal.3d 1103, 1109–10, 245 Cal.Rptr. 658, 751 P.2d 923 (1988). As reiterated by the Supreme Court of California, there is a "general, rebuttable presumption, that plaintiffs 'have knowledge of the wrongful cause of an injury.'" *Grisham v. Philip Morris USA, Inc.,* 40 Cal.4th 623, 638, 54 Cal.Rptr.3d 735, 151 P.3d 1151 (2007) (quoting *Fox,* 35 Cal.4th at 808, 27 Cal.Rptr.3d 661, 110 P.3d 914).

In addressing these questions, it is essential to keep in mind that "[t]he statute of limitations is an affirmative defense, and defendant has the burden of proving the action is time-barred." *Gallardo v. DiCarlo,* 203 F.Supp.2d 1160, 1169 (C.D.Cal.2002) (citing *O'Connor v. Boeing N. Am., Inc.,* 92 F.Supp.2d 1026, 1037 (C.D.Cal.2000); *California Sansome Co. v. U.S. Gypsum,* 55 F.3d 1402, 1407 (9th Cir.1995)) (applying California law).

As a corollary to the general accrual rule, the "discovery rule" effectively "postpones accrual of a claim until the 'plaintiff discovers, or has reason to discover, the cause of action.'" *Gallardo,* 203 F.Supp.2d at 1169 n. 13 (quoting *Norgart v. Upjohn Co.,* 21 Cal.4th 383, 397, 87 Cal.Rptr.2d 453, 981 P.2d 79 (1999)). Delayed discovery "provides that the accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its ... cause." *Jolly,* 44 Cal.3d at 1109, 245 Cal.Rptr. 658, 751 P.2d 923. Under the rule, the statute of limitation begins to run "when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." *Id.* at 1110, 245 Cal.Rptr. 658, 751 P.2d 923.

Under the discovery rule, the plaintiff bears the burden of proving "'(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.'" *Grisham,* 40 Cal.4th at 638, 54 Cal.Rptr.3d 735, 151 P.3d 1151 (quoting *Fox,* 35 Cal.4th at 808, 27 Cal.Rptr.3d 661, 110 P.3d 914) (discussing burden in pleading context, which is equally applicable to summary judgment context if the substantive evidentiary burden is modified appropriately). The plaintiff's burden under the discovery rule is the practical embodiment of the previously discussed presumption that plaintiffs know of the "wrongful cause of an injury." *Grisham,* 40 Cal.4th at 638, 54 Cal.Rptr.3d 735, 151 P.3d 1151 (internal quotation omitted). The discovery rule permits plaintiffs to rebut this presumption.

In deciding these issues, "[s]ummary [j]udgment is rarely proper where the statute of limitations runs from when plaintiff discovered or should have discovered the elements of the cause of action." William W. Schwarzer, Wallace A. Tashima, & James M. Wagstaffe, *Federal Procedure Before Trial,* § 14:297 (2009 supp.)

(quoting *Morton's Market, Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823, 832 (11th Cir.1999)). In order for the Court to grant summary judgment, the undisputed facts must establish that plaintiff was "on 'inquiry notice' as to his or her injury and claims." *Id.* (citing *Mathews v. Kidder, Peabody & Co.,* 260 F.3d 239, 251 (3d Cir.2001)). If, however, the facts regarding inquiry notice are disputed, summary judgment must be denied. *Id.*

### 2. Equitable Tolling

A plaintiff who exercises reasonable diligence in attempting to discover a cause of action may be prevented from discovering relevant information due to a defendant's wrongdoing. "A defendant's fraud in concealing a cause of action against him will toll the statute of limitations, and that tolling will last as long as a plaintiff's reliance on the misrepresentations is reasonable." *Grisham,* 40 Cal.4th at 637, 54 Cal.Rptr.3d 735, 151 P.3d 1151 (citations omitted). "'[W]hether reliance was reasonable is a question of fact for the jury, and may be decided as a matter of law only if the facts permit reasonable minds to come to just one conclusion.'" *Id.* (quoting *Boeken,* 127 Cal.App.4th at 1666, 26 Cal.Rptr.3d 638). "Where it is claimed that common knowledge undermines a plaintiff's claimed reasonable reliance on misinformation, 'a fact-finder should examine the extent of common knowledge in comparison to the alleged convincingness of the misrepresentation.'" *Id.* at 638, 54 Cal.Rptr.3d 735, 151 P.3d 1151 (quoting *Whiteley v. Philip Morris Inc.,* 117 Cal.App.4th 635, 684–85, 11 Cal. Rptr.3d 807 (2004)).

### B. RELATIONSHIP BETWEEN PLEADINGS AND FACTS INTRODUCED ON SUMMARY JUDGMENT

Defendants argue that Plaintiff may not avoid the statute of limitations by intro-

ducing proof that is not supported in her complaint's allegations. In her complaint, Plaintiff alleges that she first suffered injuries in 2001. However, the evidence introduced on summary judgment shows that Plaintiff began suffering from periodontal disease much earlier than 2001. On summary judgment, Plaintiff now introduces evidence suggesting that she did not learn of the link between smoking and periodontal disease until 2001.

Defendants' strongest argument against Plaintiff's new evidence rests on dicta from *Wasco Products, Inc. v. Southwall Techs., Inc.,* 435 F.3d 989 (9th Cir.2006). The *Wasco* court stated: "federal courts have repeatedly held that plaintiffs seeking to toll the statute of limitations on various grounds must have included the allegation in their pleadings; this rule applies even where the tolling argument is raised in opposition to summary judgment." *Id.* at 991. However, *Wasco* is distinguishable from the present case because the plaintiff in *Wasco* failed to introduce *any evidence at all* in support of its tolling argument. Instead, the *Wasco* plaintiff merely added *new allegations* in response to defendants' motion for summary judgment, arguing that defendants were engaged in a civil conspiracy whose fraudulent misrepresentations permitted plaintiff to toll the statute of limitations. The court limited its holding to situations where a plaintiff pleads that a civil conspiracy took place:

> we hold that under federal law a plaintiff must plead, at a minimum, the basic elements of a civil conspiracy if the object of the conspiracy is fraudulent. This requirement applies even if the civil conspiracy allegations are asserted only to toll the statute of limitations and even if they are raised only in opposition to summary judgment.

435 F.3d at 991 (internal citations omitted).

In support of this narrow holding, *Wasco* cites almost exclusively to cases decided at the motion to dismiss stage, all of which involved tolling arguments based on fraudulent concealment that required the plaintiffs to meet heightened pleading requirements. *See* 435 F.3d at 991. The *Wasco* court did not address, and did not cite any cases addressing, the situation at issue in our case—where Plaintiff has introduced *substantive evidence* supporting its attempt to avoid the statute of limitations. Even more importantly, the *Wasco* court only addressed *equitable tolling,* and said absolutely nothing about the discovery rule. Accordingly, Defendants' reliance on dictum from *Wasco* is misplaced.

 Given the sheer volume of energy and resources expended on this case, the Court will not dismiss the action because of Plaintiff's failure to formalistically conform her pleadings to her later-discovered evidence. Rule 15 provides that "[t]he court should freely give leave [to amend the pleadings] when justice so requires." Fed.R.Civ.P. 15(a)(2). In order for a court to seek "justice," mere technical deficiencies should not prevent a meritorious action from going forward. *See, e.g., Simons v. United States,* 497 F.2d 1046, 1049 & n. 2 (9th Cir.1974); *Smith v. Blackledge,* 451 F.2d 1201, 1202–03 & n. 2 (4th Cir.1971). In this Circuit, courts may construe other filings, including oppositions to motions, as motions to amend where amendment would be proper. *See, e.g., Kaplan v. Rose,* 49 F.3d 1363 (9th Cir.1994); *Edwards v. Occidental Chem. Corp.,* 892 F.2d 1442, 1445 n. 2 (9th Cir. 1990); *389 Orange Street Partners v. Ciarcia,* 179 F.3d 656, 665–66 (9th Cir.1999); *see also Eddy v. Virgin Islands Water and Power Authority,* 256 F.3d 204, 209–10 (3d Cir.2001) (Alito, J.).

 In fact, there is clear authority that "[a]n addition of new issues during the pendency of a summary judgment motion can be treated as a motion for leave to

amend the complaint." *Kaplan,* 49 F.3d at 1370 (citing *Roberts v. Arizona Bd. of Regents,* 661 F.2d 796, 798 n. 1 (9th Cir. 1981)); *see also* Schwarzer et al., *Federal Procedure Before Trial,* at § 14:27.1 ("courts *may* treat a party's raising new claims or defenses on a summary judgment motion as a *motion for leave to amend* the pleadings, which is normally granted *absent prejudice* to the opposing party.").

The Court accordingly treats Plaintiff's Opposition to Defendants' Motion for Summary Judgment as a motion for leave to amend the complaint to conform to evidence.

In deciding whether to *grant* Plaintiff's motion for leave to amend, the Court notes that the Ninth Circuit has "repeatedly stressed that the court must remain guided by 'the underlying purpose of Rule 15 ... to facilitate decision on the merits, rather than on the pleadings or technicalities.' " *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (quoting *Noll v. Carlson,* 809 F.2d 1446, 1448 (9th Cir.1987)). "This policy is to be applied with extreme liberality." *Eminence Capital, L.L.C. v. Aspeon, Inc.,* 316 F.3d 1048, 1051 (9th Cir.2003).

█ The Supreme Court has outlined five factors to be used in considering a motion to amend, stating:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Of these factors, "it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Capital, L.L.C. v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003).

█ Defendants do not argue that they would suffer any prejudice from an amendment of Plaintiff's complaint, or even that any of the other five factors are implicated here. Instead, Defendants appear to seek victory on a narrow technicality. Defendants have not explained how they would suffer any harm from allowing Plaintiff to introduce her new evidence. In fact, it appears that Defendants have not suffered any prejudice at all. Defendants have been aware of Plaintiff's delayed-discovery arguments—during discovery, Defendants specifically requested Plaintiff's pre–1989 medical and dental records because "plaintiff has explicitly placed both her pre–1989 medical and dental care and her awareness (including that provided by her health care providers) at issue." (Declaration of Patrick J. Gregory in Support of Defendants' Motion for Summary Judgment on the Statute of Limitations Defense, ¶ 8: Def.'s Ex. 7, at 2.) [3] In other words, the evidence strongly suggests that Defendants have not suffered any unfair surprise on account of Plaintiff's failure to plead delayed discovery of her cause of action.

Accordingly, the Court deems Plaintiff's pleadings to be constructively amended to include Plaintiff's evidence regarding delayed discovery of her cause of action. This delayed discovery argument means that Plaintiff's cause of action did not accrue until Plaintiff knew of her injuries and knew, or had reason to know, that

---

**3.** The Court does not take a position on the legal effect of Plaintiff' failure to provide these pre–1989 records. (*See* Def. UF 10.)

these injuries were caused by Defendants' wrongful acts.

## C. PLAINTIFF'S NOTICE OF CAUSE OF ACTION

### 1. Whether Plaintiff Actually Knew of the Link Between Smoking and Periodontal Disease

 Moving on to the merits of Plaintiff's delayed discovery argument, it is clear that Plaintiff knew that she had periodontal problems since at least 1990. However, Plaintiff provides evidence from her dental records showing that her dentists never explicitly connected her periodontal to her smoking until March 2001, and that she personally was unaware of the link between smoking and periodontal disease until May 2001. One of her dentists has stated that as of 1990, he believed that cigarette smoking could exacerbate a person's periodontal disease; but the same dentist has stated that in his opinion periodontal disease was not a commonly known risk of smoking even as late as March 2001. (Pl. UF 105; Def. CF 105.) Notably, during this particular dentist's examinations of Plaintiff, he never told Plaintiff of a link between her periodontal disease and her smoking. (Def. CF 105.) Other dental records and dentist depositions show that Plaintiff's dentists primarily identified her periodontal disease as arising from poor dental hygiene (that is, failure to properly brush, floss, etc.), (see e.g., Pl. UF 106, 151), and none of Plaintiff's dentists directly connected her periodontal disease with her smoking even though they knew that she smoked (Pl. UF 53–56). Various dentists and experts have stated that the public generally was unaware of the link between smoking and periodontal disease during this time. (Pl. UF 160, 162, 164.)

It is true that there were news and media accounts prior to 2001 suggesting a link between smoking and periodontal dis-ease. However, the California courts have rejected the argument that media accounts give rise to a presumption that a plaintiff was on notice of the contents of the media accounts. *See Unruh–Haxton v. Regents of Univ. of Cal.*, 162 Cal.App.4th 343, 366, 76 Cal.Rptr.3d 146 (2008) (widespread news reports of a 1995 scandal regarding the stealing of human eggs and embryos did not automatically put plaintiffs on notice that their eggs had been stolen, and they were allowed to sue in 2000); *see also Grisham*, 40 Cal.4th at 637 n. 8, 54 Cal. Rptr.3d 735, 151 P.3d 1151; *cf.* Cal.Code Civ. Proc. § 340.8 ("Media reports regarding ... hazardous material or toxic substance contamination do not, in and of themselves, constitute sufficient facts to put a reasonable person on inquiry notice that the injury or death was caused or contributed to by the wrongful act of another."). Accordingly, absent any evidence that Plaintiff actually read particular new reports, the Court will disregard Defendants' request for judicial notice of the media accounts linking smoking with periodontal disease.

Plaintiff's evidence suggests that her dentists first told her to stop smoking on March 30, 2001. (Def. UF 102–103.) Her periodontist told her that he could not place dental implants in her mouth unless she stopped smoking. This statement inspired Plaintiff to research the connection between smoking and periodontal disease, and in May 2001 she discovered on the internet that smoking and periodontal disease are linked. (Def. UF 104.)

Compare this case to *Pooshs v. Phillip Morris USA, Inc.*, C 04–1221 PJH, 2008 WL 2220422 (N.D.Cal.2008), in which a plaintiff asserted claims related to periodontal disease and other injuries. The court determined that the statute of limitations barred the plaintiff's suit filed in 2003. The court point to the following

evidence showing that plaintiff knew of her cause of action in 1990 and 1991:

> She also testified that when she was diagnosed with periodontal disease in 1990, *her periodontist told her it was directly caused by smoking.* She admitted that before she stopped smoking in 1991, she knew she had smoking-related periodontal disease.

*Id.* at *7 (emphasis added).

In contrast, in this case Plaintiff provides evidence sufficient to raise a genuine issue as to the fact that she was on actual notice of her cause of action on March 30, 2001. If such facts are proven at trial, her action may have been timely filed on March 15, 2002.

## 2. Whether Plaintiff Reasonably Should Have Known of the Link Between Smoking and Periodontal Disease

Even if Plaintiff did not *actually* know of the accrual of her cause of action, her claim may be time-barred if she *should have* known of the accrual of her cause of action at a time period outside the limitations period.

As noted above, summary judgment is a disfavored vehicle for determining whether a party exercised reasonable diligence in attempting to determine the cause of her injury. This is largely a factual issue, and in the present case, Plaintiff provides sufficient evidence to raise a genuine issue of material fact on this question. Defendants' evidence, though it very well may succeed at trial, does not incontrovertibly establish that a reasonable person in Plaintiff's shoes would have known of the link between smoking and periodontal disease prior to early 2001.

Plaintiff's own dentists and periodontists—some of whom appear to have been aware of Plaintiff's smoking habit—never told Plaintiff to stop smoking because smoking was causing her periodontal disease. Defendants introduce evidence suggesting that one of her dentists may have specifically told her to stop smoking because it was bad for her oral health. This dentist had an "impression" that Plaintiff had gingivitis and Chronic Obstructive Pulmonary Disease, and that "part" of the dentist's recommended plan was that Plaintiff should stop smoking. (Defs. UF 58; Defs.' Ex. 15, at 73:7–74:23.[4]) At deposition, the dentist did not have a "specific recollection" of whether he had actually told Plaintiff to stop smoking, but his "general habit" and "general practice" was to "communicate" to the patient his recommended plan to stop smoking. (Defs. UF 58; Defs.' Ex. 15, at 73:7–74:23.[5]) Defendants also point to evidence showing that Plaintiff filled out various dental questionnaires prior to receiving dental care, and these questionnaires all asked Plaintiff whether or not she smoked. (Defs. UF 52–56.)

Defendants assert that this evidence is sufficient to show that Plaintiff reasonably should have inquired into the link between smoking and oral health. Similarly, Defendants argue that Plaintiff was on inquiry notice of the link because of her dentists' general statements telling Plaintiff to stop smoking.

Defendants' evidence may very well establish that Plaintiff reasonably should have investigated and learned about the connection between her periodontal disease and her smoking habit; however, Defendants' evidence is not sufficient to es-

---

**4.** Note that the quoted language was stated by counsel, and the dentist adopted this language by answering counsel's questions in the affirmative.

**5.** Again, the quoted language comes from counsel, not the dentist himself.

tablish that there are no genuine issues of material fact such that Defendants are entitled to summary judgment on this question.

In addition, Defendants do not cite any cases that clearly support their arguments that vague awareness of a link between health and smoking is sufficient to put Plaintiff on inquiry notice that smoking caused Plaintiff's specific injuries. For example, in *Rose v. Fife*, 207 Cal.App.3d 760, 255 Cal.Rptr. 440 (1989), the plaintiff was time-barred from suing her doctor for injuries caused by an IUD he prescribed for her. The evidence showed that when she first was injured by the IUD, "two doctors told her *the infection was caused by the IUD." Id.* at 769, 255 Cal.Rptr. 440 (emphasis added). In other words, the plaintiff's medical providers drew a specific link between the injury and the cause of the injury. At that point, the plaintiff had reason to further inquire into whether or not her doctor acted negligently in prescribing the IUD to her. Here, in contrast, Plaintiff was never told by her medical providers that her periodontal disease was actually caused by her smoking.

Other cases include similarly clear factual situations that are distinguishable from the present case. *See Sidney–Vinstein v. A.H. Robins Co.,* 697 F.2d 880, 884 (9th Cir.1983) (plaintiff on inquiry notice of defective IUD at time she learned that she suffered injury and knew that it was caused by IUD); *Goldrich v. Natural Y Surgical Specialties,* 25 Cal.App.4th 772, 780, 31 Cal.Rptr.2d 162 (1994) (plaintiff on inquiry notice of defective breast implants at time plaintiff received three separate medical recommendations to remove the implants).

In contrast, in our case, Plaintiff had repeatedly interacted with dental professionals who apparently did not inform her that smoking was the specific cause of her periodontal disease. In fact, these profes-

sionals appear to have identified a *different* cause of the injury: bad oral hygiene, such as brushing and flossing.

Medical malpractice cases may be informative on this point. In *Sanchez v. South Hoover Hospital,* 18 Cal.3d 93, 102, 132 Cal.Rptr. 657, 553 P.2d 1129 (1976), the California Supreme Court held that medical patients are "fully entitled to rely upon the[ir] physician[s'] professional skill and judgment while under [their] care." In addition, "during the continuance of this professional relationship, which is fiduciary in nature, the degree of diligence required of a patient in ferreting out and learning of the negligent causes of his condition is diminished." *Id.* at 102, 132 Cal.Rptr. 657, 553 P.2d 1129. Obviously, such statements are not precisely on point because they involve a patient's injuries suffered at the hand of his doctor rather than a third party. Nevertheless, *Sanchez* and related cases stand for a commonsense principle that laypeople should be able to rely on medical professionals in identifying the causes of their injuries, and, as a corollary, laypeople should not be required to independently investigate the causes of their injuries when medical professionals have apparently undertaken such an investigation.

In sum, Plaintiff provides evidence sufficient to raise a genuine issue as to the fact that she was not on actual or inquiry notice of the link between smoking and periodontal disease until March 30, 2001.

3. **Whether Plaintiff Knew or Should Have Known of the Link Between Smoking and Chronic Obstructive Pulmonary Disease**

Defendants argue that Plaintiff's Chronic Obstructive Pulmonary Disease allegations and factual proof are inconsistent and contradictory. Defendants' claims are overstated. Plaintiff alleges that her Chronic Obstructive Pulmonary Disease

was diagnosed on March 28, 2001; she states that her doctor first suspected she had Chronic Obstructive Pulmonary Disease in February 2001; her evidence shows that her doctor performed tests and told her that she has either asthma or mild Chronic Obstructive Pulmonary Disease in July 2001.

Defendants point to Plaintiff's statements that she was not entirely sure whether or not she had Chronic Obstructive Pulmonary Disease, and had included it in her lawsuit mainly to "cover the bases" given her medical uncertainty about the diagnosis. (SUF 135.) Plaintiff appears to include the claim in part to recover costs related to future treatment of Chronic Obstructive Pulmonary Disease, partly because Chronic Obstructive Pulmonary Disease may develop into emphysema. (SUF 136.) Pulmonary tests in 2004 and 2009 showed that Grisham has lung functions within the normal range. (SUF 137–138.) The 2009 test, however, suggests that Grisham may have mild Chronic Obstructive Pulmonary Disease falling generally within the range of normal lung functions. (SGI 138.)

From these facts, it appears that Plaintiff has submitted sufficient evidence to raise a triable issue at to whether she was diagnosed with either Chronic Obstructive Pulmonary Disease or asthma within the appropriate time period.[6]

Defendants argue that, if Plaintiff's periodontal disease claim is deemed time-barred, the Chronic Obstructive Pulmonary Disease claim should also be time-barred under California's "first injury" rule. Under the "first injury" rule, an action for physical injuries accrues upon the time of the plaintiffs suffers her first injury.

The scope of the "first injury" rule is unclear in the wake of the California Supreme Court's *Grisham* decision. In *Grisham*, the Court determined that even if the statute of limitations bars an "earlier manifesting economic injury," a plaintiff may still proceed with a suit for "a later manifesting physical injury." 40 Cal.4th at 644, 54 Cal.Rptr.3d 735, 151 P.3d 1151. The Court refrained from deciding "whether and under what circumstances two different physical injuries arising out of the same wrongdoing can give rise to two separate lawsuits, or whether the two injuries in the present case can be conceived of as invading two different primary rights." *Id.* at 643, 54 Cal.Rptr.3d 735, 151 P.3d 1151.

Clearly, periodontal disease and Chronic Obstructive Pulmonary Disease are "two different physical injuries arising out of the same wrongdoing," and *Grisham* acknowledged that it is an open question as to whether the statute of limitations would necessarily apply to the later-incurred injury even if the limitations period had run on the earlier-incurred injury.

The Court need not address the first injury rule in the present Order. This issue is presently before the California Supreme Court, and in any event it may not be determinative in the present case. There are triable issues of fact as to whether Plaintiff filed her claim within one year after she reasonably knew of her causes of action for periodontal disease and Chronic Obstructive Pulmonary Disease. The first injury rule will only apply (if it is even retained by the Supreme Court's decision) if the Court determines that one of these causes of action is time-barred.

---

6. In any event, given the uncertainty of the legal rules regarding the statute of limitations, Plaintiff was probably prudent in filing suit even before having a definitive diagnosis.

The status of California's "first injury rule" is presently being addressed by the California Supreme Court in *Pooshs v. Phillip Morris, USA, Inc.,* Case No. S172023.

#### 4. Equitable Tolling based on Defendants' Fraud

Likewise, the Court need not address Plaintiff's arguments that the statute of limitations should be equitably tolled, as the Court has found that Plaintiff has introduced sufficient evidence to defeat Defendants' Motion for Summary Judgment on the Statute of Limitations Defense. The Court will only address equitable tolling if it determines that Plaintiff's action is actually time-barred under the discovery rule.

### D. CONCLUSION ON STATUTE OF LIMITATIONS

Plaintiff has introduced evidence establishing a genuine issue as to whether Plaintiff filed her claim within one year of the time when she knew or should have known that Defendants' conduct caused her periodontal disease and Chronic Obstructive Pulmonary Disease.

Accordingly, Defendants' Motion for Summary Judgment on the Statute of Limitations Defense is DENIED.

### IV. PLAINTIFF'S MOTION SEEKING COLLATERAL ESTOPPEL

Plaintiff seeks to use the doctrine of non-mutual offensive collateral estoppel/issue preclusion [7] to prevent Defendants from relitigating issues they have lost in other proceedings. Plaintiff asks this Court essentially to adopt the findings and holdings of the Department of Justice-litigated case *United States of America, et al. v. Philip Morris, et al.,* 449 F.Supp.2d 1

(D.D.C.2006), *affirmed in part and vacated in part,* 566 F.3d 1095 (D.C.Cir.2009), *petition for rehearing en banc denied* (Sept. 22, 2009) [the "DOJ case"].

Specifically, Plaintiff seeks to establish the following legal conclusions: Defendants have defrauded smokers and potential smokers by falsely denying the adverse health effects of smoking; Defendants have defrauded smokers and potential smokers by falsely denying that nicotine and smoking are addictive; Defendants have defrauded smokers and potential smokers by falsely denying that they manipulated cigarette design and composition so as to assure nicotine delivery levels that create and sustain addiction; and Defendants have suppressed documents, information, and research to prevent the public from learning the truth about these subjects and/or to avoid or limited legal liability.

### A. LEGAL STANDARD FOR NON-MUTUAL OFFENSIVE ISSUE PRECLUSION

Issue preclusion "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (citing *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 328–329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)).

Under federal common law,[8] non-mutual offensive issue preclusion permits a

---

**7.** A note on "non-mutual offensive issue preclusion": the requested issue preclusion is "non-mutual" because Plaintiff was not actually a party to the initial case. In contrast, "mutual" issue preclusion involves the exact same parties from the prior litigation. Also, the requested form of issue preclusion is "offensive" because Plaintiff seeks to use the initial case as a sword rather than a shield.

As an additional matter, the phrase "issue preclusion" appears to be preferred over "collateral estoppel." *See Taylor v. Sturgell,* 553 U.S. 880, 128 S.Ct. 2161, 2171 & n. 5, 171 L.Ed.2d 155 (2008).

**8.** Federal law applies because the DOJ case was decided on the basis of federal law. *See Heck v. Humphrey,* 512 U.S. 477, 488 n. 9, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

plaintiff to preclude "a defendant from re-litigating issues which a defendant previously litigated and lost against another plaintiff." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). The Ninth Circuit has articulated the necessary elements of non-mutual offensive issue:

(1) there was a full and fair opportunity to litigate the identical issue in the prior action; (2) the issue was actually litigated in the prior action; (3) the issue was decided in a final judgment; and (4) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior action.

*Syverson v. International Business Machines Corp.,* 472 F.3d 1072, 1078 (9th Cir.2007) (citations omitted). These four elements must be established by the party seeking to apply issue preclusion. *See Kamilche Co. v. U.S.,* 53 F.3d 1059, 1062 (9th Cir.1995) (citation omitted).

 These four elements are necessary but not necessarily sufficient. The Supreme Court has cautioned that district courts should exercise "broad discretion" in determining whether to apply issue preclusion in non-mutual and offensive settings. *See Parklane Hosiery,* 439 U.S. at 331, 99 S.Ct. 645. This court's exercise of discretion is important in cases involving non-mutual offensive issue preclusion. In such cases, the "element of 'fairness' gains special importance" arising out of "the equitable nature of issue preclusion." *Jack Faucett Associates, Inc. v. American Tel. and Tel. Co.,* 744 F.2d 118, 125 (D.C.Cir. 1984). Accordingly, courts must be careful to ensure that issue preclusion is implemented fairly. The Ninth Circuit has

summarized the Supreme Court's "indices of unfairness" that should inform the district court's exercise of discretion:

whether (1) "the plaintiff had the incentive to adopt a 'wait and see' attitude in the hope that the first action by another plaintiff would result in a favorable judgment" which might then be used against the losing defendant; (2) the defendant had the incentive to defend the first suit with full vigor, especially when future suits are not foreseeable; (3) one or more judgments entered before the one invoked as preclusive are inconsistent with the latter or each other, suggesting that reliance on a single adverse judgment would be unfair; and, (4) the defendant might be afforded procedural opportunities in the later action that were unavailable in the first "and that could readily cause a different result."

*Syverson v. International Business Machines Corp.,* 472 F.3d 1072, 1079 (9th Cir.2007) (citing *Parklane Hosiery,* 439 U.S. at 330–31, 99 S.Ct. 645; 18A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure,* § 4465 (2002)).

## B. THE DOJ CASE

Plaintiff wishes to establish the DOJ case as the definitive case in modern tobacco litigation. In that case, the government brought a civil RICO action against Philip Morris, Brown & Williamson (the two defendants in this case), and six other American tobacco companies.[9] The government sought damages and an injunction against future RICO violations; however, the damages claims were dismissed and the remaining injunctive claims were decided in a bench trial. The case concluded with the District Court entering a broad injunction against the defendant tobacco companies[10] preventing them from con-

---

9. The defendants also included two industry groups as well as a foreign tobacco company. The foreign company was dismissed for lack of personal jurisdiction. 449 F.Supp.2d at 31 n. 4.

10. Except Liggett, which did not participate in the common defense. 449 F.Supp.2d at 31 n. 4.

tinuing to engage in fraud and deception regarding the health risks of smoking.

Following seven years of litigation and a nine-month trial, Judge Gladys Kessler issued a 1,600-page ruling containing thousands of factual findings. The case was affirmed in relevant part [11] on appeal to the D.C. Circuit, which applied a "clear error" standard of review, see 566 F.3d at 1110, 1126, 1134. The defendants in that case petitioned the D.C. Circuit for a rehearing en banc, which was denied on September 22, 2009. The defendants appear to be planning a petition to the United States Supreme Court for writs of certiorari. See Defendants' Motion to Stay Issuance of the Mandate Pending the Filing and Disposition of Petitions for Writs of Certiorari, Case Nos. 06–5267, 06–5268, 06–5269, 06–5270, 06–5271, 06–5272, 06–5332, 06–5367, 07–5102, 07–5103 (D.C.Cir., filed Sept. 28, 2009).

 It is well-established that a District Court's judgment is a final judgment for purposes of issue preclusion, even if an appeal is pending on that judgment. See Robi v. Five Platters, Inc., 838 F.2d 318, 327 (9th Cir.1988) ("[I]n federal courts . . . the preclusive effects of a lower court judgment cannot be suspended simply by taking an appeal that remains undecided.") (quoting Wright et al., Federal Practice and Procedure, § 4433). Nevertheless, it would be a waste of everybody's time if the Court grants Plaintiff's motion only to have the underlying preclusive decision be overturned on appeal. (Def. Opp. at 3 n. 2.) Thus, a stay would be advisable if the Court agrees with Plaintiff that issue preclusion is appropriate. However, a stay would be unnecessary if the Court agrees with Defendants that preclusion is inappropriate.

## C. PRIOR ANALYSIS OF THE PRECLUSIVE EFFECT OF THE DOJ CASE

As a preliminary matter, it is helpful to examine whether or not other courts have afforded preclusive effect to the DOJ case.

In Schwab v. Philip Morris USA, Inc., 449 F.Supp.2d 992, 1079 (E.D.N.Y.2006), rev'd on other grounds sub nom McLaughlin v. Amer. Tobacco Co., 522 F.3d 215 (2d Cir.2008), Judge Weinstein of the Eastern District of New York specifically declined to give the DOJ case preclusive effect in a class-action civil RICO action regarding tobacco companies' marketing and sale of "light" cigarettes.

Judge Weinstein's decision in Schwab was based partly on the fact that Liggett, one of the defendants in that case, had prevailed in the DOJ case. 449 F.Supp.2d at 1079. Liggett's presence as a party in that case meant that estoppel would have applied to some of the defendants but not others. Id. The court determined that Liggett's presence would have confused the jury and reduced the administrative benefits of estoppel. Id. The court also determined that the vast number of prior verdicts entered in the tobacco companies' favor counseled against applying issue preclusion. Id. (But in rebuttal to this point, see infra regarding Plaintiff's argument that no previous court has rendered a verdict in Defendants' favor on fraud claims— an argument that Judge Weinstein did not address.)

The court's third reason (which is most relevant for present purposes) was that proof of the plaintiffs' reliance and damages would have required a great deal of overlap with the evidence on which preclusion was premised. Id. Accordingly, with

---

**11.** The Circuit Court reversed the District Court's findings of liability against two tobacco trade organizations. The Circuit Court also reversed parts of the District Court's remedial order.

little efficiency to be gained and a significant amount of potential prejudice to the defendants, the court exercised its discretion to prevent the DOJ case from estopping the case at bar.

As discussed *infra,* the Court concurs with Judge Weinstein's ultimate conclusion in *Schwab.*

## D. WHETHER THE NECESSARY ELEMENTS OF ISSUE PRECLUSION HAVE BEEN MET

 In order for the Court to grant Plaintiff's motion for summary judgment on the basis of issue preclusion, Plaintiff must first satisfy the four necessary elements of *Parklane.*

### 1. First Necessary Element: Full and fair opportunity to litigate

Defendants had full opportunity to litigate the DOJ case vigorously. In fact, they are still in the process of exhausting every possible method of appealing the decision.

Whether Defendants had a "fair" opportunity to litigate is discussed more thoroughly *infra.* There is no question that the DOJ proceedings were fair. Nevertheless, "fairness" is a broad consideration that requires its own separate inquiry.

### 2. Second Necessary Element: Issue was actually litigated

The relevant issues were in fact litigated in the DOJ case.

### 3. Third Necessary Element: Issue was decided in final judgment

The relevant issues of fraud, deception, and misrepresentation were decided in the final judgment of the DOJ case. Of course, even if the Court allows preclusion on these issues, Plaintiff will still have to prove causation, reliance, and damages in her own case. As Defendants put it, "this case is about the personal injury claims of *this plaintiff* and necessarily must be restricted by the plaintiff's individual circumstances and injury." (Def. Opp. at 21.) Generally speaking, the need for potentially voluminous evidence of causation, reliance, and damages would counteract any efficiency benefits from issue preclusion. *See Acevedo–Garcia v. Monroig,* 351 F.3d 547, 576–77 (1st Cir.2003) ("Where even one issue of liability must be made available to defendants in the second trial, granting preclusive effect to the other issues may not result in efficiency gains because litigation of the 'live' issue may require introduction of some of the same evidence pertinent to the estopped issues.").

Plaintiff notes, however, that she seeks to establish the limited factual issue that Defendants "intended fraudulent conduct." (Pl. Reply at 9.) But even within this narrow issue, Plaintiff has not satisfied her initial burden of meeting the requirements of the *Parklane Hosiery* test. The Ninth Circuit requires a showing that the preclusive issues "were *necessary* to support the court's judgment in the first action," and not "merely *incidental* to the judgment in the prior action." *Resolution Trust Corp. v. Keating,* 186 F.3d 1110, 1114 (9th Cir. 1999) (citing *Segal v. American Tel. & Tel. Co., Inc.,* 606 F.2d 842, 845 n. 2 (9th Cir. 1979)) (emphasis added). The moving party clearly bears the burden of establishing the necessary elements of issue preclusion, including the element that the issues and facts were essential to the judgment. *See Kamilche Co. v. United States,* 53 F.3d 1059, 1062 (9th Cir.1995) (citation omitted). The moving party must identify the essential facts, and "[n]either the district court nor the defendant is required to engage in a 'hunt and peck' exercise to ferret out potentially relevant and necessary findings." *Pool Water Products v. Olin Corp.,* 258 F.3d 1024, 1033 (9th Cir.2001). In addition to identifying the essential facts, Plaintiff must also "establish" that these

facts meet the legal requirements "for each issue as to which it seeks" preclusive effect in the later case. *Id.* at 1033 (discussing whether issue preclusion permits party to establish "prima facie weight" to Administrative Law Judge's findings of fact in subsequent Federal Trade Commission action).

The *Restatement (Second) of Judgments,* § 27 (1980), explains the reasons for requiring that the underlying facts and issues were essential to the previous judgment. If the issues were not essential to the prior judgment, these "determinations have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made. In these circumstances, the interest in providing an opportunity for a considered determination, which if adverse may be the subject of an appeal, outweighs the interest in avoiding the burden of relitigation." *Restatement,* § 27, cmt. h. The *Restatement* further explains that issue preclusion applies both to "evidentiary facts" and "ultimate facts" (that is, conclusions of law), but only if the parties in the previous litigation treated the fact or issue as "important" and the previous court treated the fact or issue as necessary to the judgment. *Id.* at § 27, comment j.

Plaintiff argues that the decision in the DOJ contains a remarkable level of "detail and specificity" which would assist this Court in determining the reasoning used by the court in that case. (Mot. at 23.) Plaintiff provides a 134–page appendix that includes roughly 2,600 factual findings quoted from the DOJ case (out of a total of roughly 4,000 factual findings in the DOJ case). (*See* Pl. Appx. A.) Though Plaintiff organizes these findings as they pertain to each of Plaintiff's four main arguments, Plaintiff does not explain how any of these 2,600 findings were outcome determinative in the previous action. Obviously, it is burdensome to require Plaintiff to detail the reasoning in the DOJ case with respect to these 2,600 facts. But it would be equally burdensome for the Court to engage in this analysis. Ultimately, the Ninth Circuit requires that Plaintiff, not the Court, undertake this analysis. Plaintiff has not done so.

Further, it is helpful to point out that among Plaintiff's list of 2,600 "essential" findings, a significant number relate specifically to non-parties such as R.J. Reynolds and American Tobacco, and do not even mention Defendants Philip Morris and Brown & Williamson. This suggests that Plaintiff was not exercising adequate editorial discretion in culling Judge Kessler's order to its essential and necessary elements. Findings regarding the activities of R.J. Reynolds and American Tobacco are simply not "essential" and "necessary" to support the DOJ case's ultimate findings against Philip Morris and Brown & Williamson. Had Plaintiff undertaken a careful analysis of why the 2,600 proposed findings were essential and necessary, Plaintiff's Appendix would likely be significantly shorter than 134 pages.

In short, Plaintiff has failed to met her burden of explaining how the 2,600 quoted findings were outcome determinative with respect to Defendants in the previous case. Without such a showing, the Court cannot deem these findings to be conclusively established in the present case. The Court declines Plaintiff's implicit invitation to "engage in a 'hunt and peck' exercise" of sifting through the 134–page Appendix to find a few relevant nuggets regarding these two Defendants' conduct. *See Pool Water Prods.,* 258 F.3d at 1033; *see also Carmen v. San Francisco Unified School District,* 237 F.3d 1026, 1029 (9th Cir.2001) (court need not "comb the record" looking for evidence to establish a party's contentions on summary judgment). The Court is not willing to engage in the lengthy and

difficult process of deciding which of the facts were essential, rather than merely incidental, to the DOJ case's ultimate finding of liability.[12]

### 4. Fourth Necessary Element: Party was a party in other action

Defendants were parties to the DOJ case. However, with respect to this element, the Court again expresses its concern that many of the DOJ case's findings refer generically to "Defendants." The DOJ case often treated the various tobacco companies as a single RICO enterprise rather than as individual actors. The Court cannot allow the collective wrongful acts of American tobacco companies to bind the specific Defendants involved in this case, Philip Morris and Brown & Williamson. And to the extent that the DOJ case's findings specifically stated that "all" the Defendants in that case had engaged in certain conduct, Plaintiff here would still have to introduce evidence regarding *these* Defendants' wrongful conduct on which Plaintiff relied. The introduction of this evidence would essentially render issue preclusion moot—there is no efficiency-based reason to grant issue preclusion and then require the introduction of additional evidence relating to each of the precluded issues.

### E. WHETHER THE INDICIA OF UNFAIRNESS COUNSEL AGAINST PRECLUSION

 Had Plaintiff had met its threshold burden of satisfying the four basic *Parklane Hosiery* requirements, the Court would be required to examine the Ninth Circuit's indicia of unfairness. The Court believes that, even if Plaintiff had satisfied its basic burden, issue preclusion would still be inappropriate in this particular case.

### 1. Multiple Inconsistent Judgments

Defendants rely heavily on the argument that Plaintiff is "cherry-picking" the favorable DOJ judgment and ignoring the various judgments rendered in the tobacco companies' favor. Obviously, "[a]llowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Parklane Hosiery*, 439 U.S. at 330–331, 99 S.Ct. 645.

Countless courts have refused to apply issue preclusion in situations where there were inconsistent judgments on the books. (*See* Def. Mot. at 7–8 (collecting cases).) This is particularly true in cases where different juries reach contradictory verdicts. Such inconsistent verdicts reflect the fact that these outcomes "may have been based on equally reasonable resolutions of doubt as to the probative strength of the evidence or the appropriate application of a legal rule to the evidence" in each case. *See Jack Faucett Assocs. v. AT & T Co.*, 744 F.2d 118, 124–25 (D.C.Cir.1984). On this basis, one court has even suggest-

---

12. The Court also harbors doubts as to whether Plaintiff has satisfied her burden of showing that the proposed preclusive findings are "identical" to the issues in the previous case within the four-part framework set out in *Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir.1995) (quoting *Restatement*, § 27 (comment c)), *amended on other grounds*, 75 F.3d 1391 (1996).

The four-part *Kamilche* test requires showing of: (1) "a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first," (2) "the application of the same rule of law as that involved in the prior proceeding," (3) "pretrial preparation and discovery related to the matter presented in the first action [was] reasonably ... expected to have embraced the matter sought to be presented in the second," and (4) "the claims involved in the two proceedings" are "closely related." *Id.*

ed "that offensive collateral estoppel could not be used in mass tort litigation." *In re Bendectin Prods. Liab. Litig.,* 749 F.2d 300, 305 n. 11 (6th Cir.1984) (citing *Parklane Hosiery* ).

However, Plaintiff properly points out that a number of the inconsistent prior cases should be discarded because Defendants improperly asserted attorney-client privilege to withhold central inculpatory documents. The DOJ findings of fact establish that at various time during prior litigation, the tobacco companies "improperly sought to conceal research material behind the attorney-client privilege and the work product doctrine in order to avoid discovery." *United States v. Philip Morris USA, Inc.,* 449 F.Supp.2d at 832.

Further, and more importantly, Plaintiff points out that many of Defendants' purportedly "inconsistent" prior cases involved completely different legal claims, such as secondhand smoke-related injuries. Defendants do not point to any case that shows a jury finding in favor of tobacco companies with respect its underlying fraudulent intentions and actions. For example, Defendants rely on *Reller v. Philip Morris Inc.,* No. BC 261796, 2005 WL 6141400 (Cal.Sup.Ct.2005), which found for defendants on an intentional concealment claim. But in that case the jury specifically found that the defendants had "intentionally conceal[ed] or suppress[ed] ... fact[s] with the intent to defraud" the plaintiff. The jury only returned a verdict in favor of the defendants because it also found that the plaintiff was aware of the concealed facts at the time he began smoking. (Declaration of Patrick J. Gregory in Support of Defendants' Memorandum in Response to Plaintiff's Supplemental Brief on Collateral Estoppel/Issue Preclusion in Relation to Motion to Stay, ¶ 12; Defs.' Ex. A: Special Verdict Form, questions 1–2.)

Defendants argues that two fraud/conspiracy cases resulted in opposite outcomes from the DOJ case: *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* No. 98 CV 3287 (E.D.N.Y.) and *Iron Workers Local Union v. Philip Morris, Inc.,* No. 1:97 CV 1422 (N.D.Ohio). These two cases involved federal or state racketeering charges similar to those at issue in the DOJ case. Both of the other cases ended with jury verdicts in favor of the tobacco companies. Plaintiff, however, helpfully points out that these jury verdicts cannot be deemed inconsistent with the DOJ case because these jury verdicts involved claims brought by third party fiduciaries suing derivatively on behalf their beneficiaries.

*Blue Cross* involved a health insurer's suit against tobacco companies to recover medical expenses related to smoking. The plaintiff insurer indirectly incurred these medical expenses in the course of providing insurance to individuals who smoked. The suit was premised on RICO-based schemes to defraud similar to those at issue in the DOJ case. The jury returned a verdict in favor of the tobacco companies on these fraud issues. In contrast, though, the jury returned a verdict for plaintiffs on the state-law fraud and misrepresentation claims. This state law-based verdict was subsequently overturned on appeal after a state court decided a certified question regarding whether insurers could sue derivatively on behalf of their customers. *See Empire Healthchoice, Inc. v. Philip Morris USA, Inc.,* 393 F.3d 312 (2d Cir. 2004); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA, Inc.,* 3 N.Y.3d 200, 785 N.Y.S.2d 399, 818 N.E.2d 1140 (2004). Thus, as Plaintiff points out, to the extent that the jury decided anything, the jury decided that the defendants engaged in fraudulent behavior that violated state fraud laws. This decision was overturned

on the basis of standing, not on the merits of the tobacco companies' conduct.

*Iron Workers* involved labor union trust funds who were also suing to recover health care expenses related to smoking. The suit alleged state-law racketeering claims that were based on the same basic allegations of fraud as in the DOJ case. The *Iron Workers* jury returned a verdict in favor of the tobacco companies. But based on the nature of the jury instructions, it is unclear whether the jury decided that the defendants did or did not engage in fraudulent activities. The decision may have hinged on the issue of the third party fiduciary's standing rather than the defendants' conduct.

In addition to these two cases with results contrary to the DOJ decision, a third case involving RICO fraud-based allegations resulted in a hung jury. *Falise v. American Tobacco Co.*, No. 99–cv–7392 (E.D.N.Y.). The plaintiffs in that case declined to retry those parts of their case. Generally, hung juries are treated as inconsistent judgments for purposes of preclusion analysis. *See Setter v. A.H. Robins Co., Inc.*, 748 F.2d 1328, 1330 (8th Cir.1984).

Ultimately, it appears that Plaintiff has not "cherry-picked" the DOJ case simply because it suits Plaintiff's case. Instead, the various tobacco cases have generally avoided litigating the questions of fraud at issue in the DOJ case and in the present case. In addition, many of the prior cases were litigated before plaintiffs had access to the full panoply of evidence of tobacco companies' bad acts. Finally, and most importantly, no previous case appears to include an ultimate finding of fact absolving tobacco companies of liability on the basis that they *did not engage* in fraudulent activities. Rather, the verdicts in favor of the tobacco companies are based on issues such as standing, absence of harm, or plaintiffs' non-reliance on the fraud.

In short, the Court does not believe that Plaintiff has engaged in cherry-picking.

## 2. Procedural Opportunities

The other relevant "indicia of fairness" is whether "the defendant might be afforded procedural opportunities in the later action that were unavailable in the first 'and that could readily cause a different result.'" *Syverson*, 472 F.3d at 1079 (quoting *Parklane*, 439 U.S. at 330–31, 99 S.Ct. 645). This factor provides an appropriate opportunity for the Court to examine the various due process considerations that weigh against using the DOJ case preclusively. *See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1230 n. 1 (10th Cir.2003) ("[B]ecause the doctrine of offensive collateral estoppel might be reapplied on remand, the district court should be mindful that such application impacts ... [the] due process rights of defendants.")

First, the DOJ case was an equitable action, so the decision was reached through a bench trial. Defendants were denied the procedural protections of a jury trial, which they would be entitled to in this action under the Seventh Amendment. That said, the Supreme Court in *Parklane* determined that the Seventh Amendment does not bar offensive issue preclusion. *See generally* 439 U.S. at 333–37, 99 S.Ct. 645. In reaching this conclusion, the Supreme Court puzzlingly stated that "the presence or absence of a jury as factfinder is basically neutral, quite unlike, for example, the necessity of defending the first lawsuit in an inconvenient forum." *Id.* at 332 n. 19, 99 S.Ct. 645. The Supreme Court's suggestion that civil juries are less important than convenient forums is somewhat difficult to comprehend. Certainly, there are due process considerations surrounding inconvenient forums; but there is an even clearer Constitutional provision that specifically addresses the right to a jury trial in civil actions. *See generally id.*

at 338–56, 99 S.Ct. 645 (Rehnquist, J., dissenting).

■ In light of the clear Constitutional interest supporting civil jury trials, *Parklane's* discussion is better understood as establishing that courts are not *automatically prohibited* from granting issue preclusion on account of the fact that the initial action was decided in a bench trial and the subsequent action allows for a jury trial. Rather, the better view of *Parklane* is that courts, in retaining "broad discretion" over the decision of whether to allow issue preclusion, *see id.* at 331, 99 S.Ct. 645, may consider the absence of a jury trial as a *non-dispositive* factor when balancing the equities of issue preclusion. This is the view taken in *Whelan v. Abell,* 953 F.2d 663, 669 (D.C.Cir.1992), *cert. denied sub nom. Toomey v. Whelan,* 506 U.S. 906, 113 S.Ct. 300, 121 L.Ed.2d 223 (1992). In *Whelan,* the court determined that the District Court had discretion to reject issue preclusion in a bench-trial-first, jury-trial-second scenario. *Whelan* is admittedly distinguishable because in that case, a finding of issue preclusion would have inverted the parties' burdens. However, the court's basic principle is sound: a District Court may consider the deprivation of a jury trial when exercising its discretion to reject issue preclusion in a particular case.

Here, in addition to basic concerns about Defendants' interest in having a jury decide the case,[13] Plaintiff's claim for punitive damages raised additional due process concerns. The Supreme Court's recent punitive damages cases identify some of the heightened due process considerations surrounding punitive damages awards. Though there have been prior cases permitting issue preclusion in cases involving punitive damages claims, *see, e.g., Bates v. Union Oil Co. Of Cal.,* 944 F.2d 647 (9th Cir.1991), these cases appear to have been decided before the Supreme Court identified the due process limits on punitive damages. *See BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

Courts uniformly hold that a jury must determine the amount of punitive damages awarded. *See Morgan v. Woessner,* 997 F.2d 1244, 1255–56 (9th Cir.1993); *Hartford Fire Ins. Co. v. First Nat. Bank of Atmore,* 198 F.Supp.2d 1308, 1312 (S.D.Ala.2002) ("[T]he Courts of Appeal ... have uniformly recognized that the Seventh Amendment requires that the amount of punitive damages be set by the jury.") (collecting cases). It is Constitutionally mandated that a jury determine the amount, if any, of punitive damages to award Plaintiff.

Admittedly, the Supreme Court's recent punitive damages jurisprudence focuses mainly on the Constitutionally permissible *amount* of punitive damages. However, some of the Supreme Court's underlying considerations are relevant in the present case. According to the Supreme Court:

> In our view, the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for *injury that it inflicts upon nonparties* or those whom they directly represent, i.e., injury that it inflicts upon those who are, essentially, strangers to the litigation.

*Philip Morris USA v. Williams,* 549 U.S. 346, 353, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007) (emphasis added).

Of course, the Supreme Court's actual holding involved the specific question of whether a jury may consider injuries to third party non-litigants when deciding the *size* of a punitive damages award. Howev-

---

**13.** Out of deference to the Supreme Court's footnote 19 in *Parklane,* the Court refers to Defendants' desire for a jury trial as an "interest" rather than a "right."

er, if this Court were to grant Plaintiff's request for issue preclusion, Defendants' underlying liability would be established in part based on actions that inflicted injuries upon nonparties. In light of the Supreme Court's decision in *Philip Morris*, the jury would have to be admonished to compartmentalize certain factual findings when determining liability and punitive damages. The jury could very well be confused about what facts may or may not be considered when determining punitive damages. Further, *Philip Morris* requires Plaintiff to introduce voluminous evidence regarding the specific harms that Defendants' wrongful actions caused her. Such new evidence largely duplicates the DOJ case's basic findings, thus negating the efficiency-related benefits provided by issue preclusion. *See Setter v. A.H. Robins Co., Inc.*, 748 F.2d 1328, 1330–31 (8th Cir.1984). Accordingly, had Plaintiff even satisfied her threshold burden of establishing the four necessary *Parklane* elements, the Court would still be unwilling to grant Plaintiff's request for issue preclusion. *See Schwab*, 449 F.Supp.2d at 1079 (denying request for issue preclusion based in part on efficiency and prejudice concerns.) [14]

Accordingly, even if Plaintiff had convinced the Court that issue preclusion is prima facie proper under *Parklane's* four necessary elements, the Court believes that procedural fairness considerations would ultimately weigh against allowing issue preclusion in the present case. The Court is wary of depriving Defendants of their Seventh Amendment interest in having a jury decide the factual basis for Plaintiff's claim. The Court is also concerned with protecting Defendants' rights under the Due Process Clause, which require that a jury determine the amount of punitive damages. If the Court were to allow issue preclusion while simultaneously protecting Defendants' Constitutional interests, there would be minimal efficiency gains and a substantial likelihood of jury confusion and prejudice. In these circumstances, the Court would have to exercise its equitable discretion and reject Plaintiff's request for issue preclusion.

### F. CONCLUSION REGARDING IS-SUE PRECLUSION

Plaintiff's Motion to Stay and Request for Collateral Estoppel/Issue Preclusion is DENIED.

### V. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO 1ST, 2ND, 4TH, AND 6TH CAUSES OF ACTION

Defendants have also submitted a Motion for Summary Judgment that certain of Plaintiff's causes of action and theories of liability fail as a matter of law.

Defendants seek summary judgment that: Plaintiff's negligent design and strict products liability claims fail; Plaintiff's fraudulent concealment claim fails; and Plaintiff's breach of express warranty claim fails.

14. There are additional due process considerations at stake "where a tangled or complex fact situation would make it unfair to one party to determine damages apart from liability." *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 455 (3d Cir.2001); *see also Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931) (finding due process violation where "the question of damages on the counterclaim is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial").

The *Gasoline Products* decision, while not directly on point, further informs the Court's discretion in its considerations of Defendants' due process rights.

## A. PRODUCT LIABILITY

Plaintiff's First and Second Causes of Action assert that Defendants' products were defective in design, and that Defendants are liable under both strict liability and negligence theories of product liability.

■■■ California law recognizes three different tests for establishing product liability. A product manufacturer is liable for "injuries caused by a product that is (1) defectively manufactured, (2) defectively designed, or (3) distributed without adequate instructions or warnings of its potential for harm." *Arnold v. Dow Chemical Co.*, 91 Cal.App.4th 698, 715, 110 Cal. Rptr.2d 722 (2001) (citing *Barker v. Lull Eng'g Co.*, 20 Cal.3d 413, 428, 143 Cal. Rptr. 225, 573 P.2d 443 (1978)).

At issue is the second theory: defective design.

### 1. Defective Design

In relevant part, two tests are used to determine if a product is defective in design: "[1] the benefits of the design do not outweigh the risk of danger inherent in the design, or [2] if the product, used in an intended or reasonably foreseeable manner, has failed to perform as safely as an ordinary consumer would expect." *Bullock v. Philip Morris USA, Inc.*, 159 Cal. App.4th 655, 674, 71 Cal.Rptr.3d 775 (2008) (citing *Baker*, 20 Cal.3d at 41, 141 Cal. Rptr. 315, 569 P.2d 1303). These tests are known as the "risk-benefit test" and the "consumer expectations test." (A third test, "failure-to-warn," is not at issue in the present case.)

### a. Risk–Benefit Test

■■■ In order to prevail under the strict liability risk-benefit test, Plaintiff must show that the benefits of the cigarette designs at issue do not outweigh the risks of danger created by those designs.

At summary judgment, Plaintiff must "make[ ] a prima facie showing that the injury was proximately caused by the product's design." *Barker*, 20 Cal.3d at 431, 143 Cal.Rptr. 225, 573 P.2d 443. Following this showing, the burden of proof "shift[s] to the defendant to prove, in light of the relevant factors, that the product is not defective." *Id.* at 431–32, 143 Cal. Rptr. 225, 573 P.2d 443 (citations omitted). Courts have interpreted this standard as requiring that a plaintiff must identify a "specific design feature of the product," *Papike v. Tambrands, Inc.*, 107 F.3d 737, 743 (9th Cir.1997), and must also "establish a significant probability of causation between defective product and enhanced injuries," *Endicott v. Nissan Motor Corp.*, 73 Cal.App.3d 917, 928, 141 Cal.Rptr. 95 (1977).

The parties' central dispute involves the effect of Plaintiff's expert's declaration and proposed testimony. Defendants assert that Plaintiff's claim fails because she has not established to a reasonable degree of medical certainty that a specific design defect was a substantial factor in causing her alleged injuries. (Mot. at 6.)

The leading case on this question is *Whiteley v. Philip Morris, Inc.*, 117 Cal. App.4th 635, 11 Cal.Rptr.3d 807 (2004). In that case, the court determined that the evidence produced at trial did not support the jury's verdict finding liability for negligent design defects. The court focused on the "causation" element of a design defect claim.[15] The court determined that the causation requirement is only satisfied if a plaintiff establishes to a reasonable degree of medical certainty that a specific design defect was a substantial factor in causing her alleged injuries. *Id.* at 701, 11 Cal. Rptr.3d 807.

---

**15.** Causation is identical in both negligence and strict liability design defect actions. *Id.* at 694 n. 29.

In *Whiteley,* the court determined there was insufficient evidence of causation because the plaintiff's expert failed to connect the purported design defects of cigarettes with the likelihood of the plaintiffs developing cancer. *Id.* Though the expert established that certain carcinogens could be removed from cigarettes, he did not establish that these specific design choices, "as distinguished from smoking cigarettes in general," were a substantial factor in causing the plaintiff's cancer. *Id.* at 701–02, 11 Cal.Rptr.3d 807. The court also did not credit the testimony that cigarette companies could have removed carcinogens from cigarettes to make them safer because there was no evidence that the plaintiff would have smoked such "safer" cigarettes. *Id.* Nor did the court credit the testimony that cigarette companies' manipulation of addictive properties caused plaintiffs to smoke more and thus consume more carcinogens, given that plaintiffs introduced no evidence that they would have smoked those "safer" cigarettes (and in fact, when the decedent initially switched from unfiltered to filtered cigarettes, he began smoking *more* cigarettes). *Id.* at 702, 11 Cal.Rptr.3d 807.

■ The present case is distinguishable from *Whiteley.* Here, Plaintiff provides a declaration from one of her medical experts, Dr. William Farone, asserting that there are identifiable chemicals in cigarette smoke that can attack and irritate tissue and cells in the mouth that increase the likelihood of causing periodontal disease. (Pl. UF 44–45.) Farone also identifies specific chemical additives which increase levels of harmful chemicals in cigarette smoke. (Pl. UF 65.) In addition, Farone states that in his opinion there are feasible modifications to cigarettes that would reduce these harmful chemicals and/or reduce the harmful effects they produce. (Pl. UF 66.)

This evidence is sufficient to establish a genuine issue of material fact as to whether design defects caused Plaintiff's periodontal disease and Chronic Obstructive Pulmonary Disease. Dr. Farone's report states that "[s]ome of" cigarettes' chemical "additives can increase the levels of carcinogens and other harmful chemicals in cigarette smoke." (Pl. Ex. 4 at 8.) Farone has also asserted that "the modern cigarette combines several technologies *specifically designed* and intended to make it more inhalable and *addictive.*" (Pl. UF 65.) Farone's report also states that, in his opinion, feasible modifications to cigarettes could make them more safe by reducing levels of "nitrosamines," "carbon monoxide," "inorganic carcinogens," "polyaromatic hydrocarbons," and "aldehydes" in tobacco, cigarettes, and cigarette smoke. At his deposition, Farone stated that, on the basis of the chemistry, it is more likely than not that "alehydes, acids," "acetaldehyde," "formaldehyde," and other "tissue irritants" attack oral tissue and make the mouth more susceptible to the bacteria that cause periodontal disease. (Farone Depos., at 41–43.) Finally, Plaintiff offers various assertions that "[w]ithin a reasonable medical probability," her Chronic Obstructive Pulmonary Disease "was caused by her cigarette smoking." (Pl. UF 51.) Finally, Plaintiff has introduced evidence that she would have smoked safer cigarettes had they been available (Declaration of Frances M. Phares in Support of Pl.'s Opp. To Def.'s Motion for Summary Judgment ["Phares Decl."], ¶ 2; Ex. 1, ¶ 3.,) and that her addiction caused her to smoke more than she would have otherwise smoked. (Pl. UF 54, 60.)

Accordingly, Plaintiff has identified evidence suggesting that cigarettes have been designed with additives that specifically increase the likelihood of causing periodontal disease. Further, Plaintiff has identified evidence suggesting that cigarettes have been designed to be more addictive.

Plaintiff has introduced evidence that she smoked more because she was addicted, and that exposure to cigarette smoke increases the likelihood that smokers develop periodontal disease and Chronic Obstructive Pulmonary Disease. Plaintiff has therefore presented a triable issue for the jury as to whether Defendants' products could have been designed more safely, and whether these unsafe design elements caused Plaintiff's injuries.

### b. Consumer Expectations Test

■ To succeed on a "consumer expectations" theory of product liability, the plaintiff must show that a product failed to perform as safely as an ordinary consumer would expect when the product is used in an intended or reasonably foreseeable manner. It is usually a question of fact for the jury to determine whether the product meets these ordinary expectations. *See Cronin v. J.B.E. Olson Corp.*, 8 Cal.3d 121, 132–33, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972) ("[I]f, *in the view of the trier of fact,* the 'ordinary consumer' would have expected the defective condition of a product, the seller is not strictly liable regardless of the expectations of the injured plaintiff.") (emphasis added); *Arnold v. Dow Chemical Co.*, 91 Cal.App.4th 698, 717, 110 Cal. Rptr.2d 722 (2001) (citing *Sparks v. Owens–Illinois, Inc.*, 32 Cal.App.4th 461, 472, 38 Cal.Rptr.2d 739 (1995)).

■ The parties' central dispute involves the question over whether the federal Cigarette Labeling Act, 15 U.S.C. § 1333 et seq., preempts Plaintiff's particular claims as they related to Defendants' post-Cigarette Labeling Act activities. The Cigarette Labeling Act has been interpreted to "preempting damage claims based upon a failure-to-warn theory that requires a showing that post–1969 advertising or promotions should have included additional or more clearly stated warnings, or that its advertising tended to minimize or neutralize the health hazards associated with smoking." *Boeken v. Philip Morris, Inc.*, 127 Cal.App.4th 1640, 1674, 26 Cal. Rptr.3d 638 (2005) (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 524, 527–27, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). Accordingly, Defendants attempt to characterize Plaintiff's consumer expectations claim as being a preempted failure-to-warn claim.

■ Defendants are misguided. A cause of action for "product liability under a failure-to-warn theory is a distinct cause of action from one under the consumer expectation test." *See Boeken v. Philip Morris, Inc.*, 127 Cal.App.4th 1640, 1669, 26 Cal.Rptr.3d 638 (2005); *see also Arnold v. Dow Chem. Co.*, 91 Cal.App.4th at 717, 110 Cal.Rptr.2d 722 (citing *Soule v. General Motors Corp.*, 8 Cal.4th 548, 34 Cal. Rptr.2d 607, 882 P.2d 298 (1994); *Arena v. Owens–Corning Fiberglas Corp.*, 63 Cal. App.4th 1178, 1184, 74 Cal.Rptr.2d 580 (1998)). Further, where a product manufacturer can make its product safer by communicating with consumers "through means other than advertising and promotion [which are preempted by the Cigarette Labeling Act]," the product liability claims falls outside the preemptive reach of the Cigarette Labeling Act. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1148 (9th Cir.2005) (discussing non-preemption of Nevada failure-to-warn law).

Accordingly, for purposes of the present motion, Plaintiff's consumer expectations claim is not preempted as a matter of law. The important question, then, is whether Plaintiff has established a triable issue of fact under the consumer expectations test.

Plaintiff has introduced evidence sufficient to establish a triable issue as to whether Defendants' products failed to meet consumer expectations and caused injury to Plaintiff. In *Boeken*, the Court of Appeal permitted a verdict based in part on a consumer expectations theory because the plaintiff had introduced evi-

dence specifically linking the effects of low-tar cigarettes (smoking more deeply) to the plaintiff's injury (lung cancer). The court found that "[c]ompensation by smokers draws carcinogens further into the lungs, which is more likely to cause adenocarcinoma of the lung, a more aggressive form of cancer than those more prevalent among smokers of regular-strength cigarettes." 127 Cal.App.4th at 1668, 26 Cal.Rptr.3d 638. The court held that this evidence was sufficient to establish liability on the consumer expectations theory: "Since smokers do not know they compensate, a warning may not make the product any safer. Philip Morris's own expert, Dr. Richard Carchmann, admitted that the only way to reduce the risk is to quit smoking." *Id.* at 1669 n. 16, 26 Cal. Rptr.3d 638.

In the present case, Plaintiff introduces evidence sufficient to establish a triable issue about the consumer expectations test as it was applied in *Boeken.* Plaintiff's evidence suggests that Defendants' nicotine manipulation contributed to her addiction and caused her to smoke more cigarettes (which includes "compensating" when smoking "low tar" and "light" cigarettes by smoking more of those cigarettes). Defendants admit that Plaintiff introduces such evidence by stating that "Plaintiff offers no evidence which links these assertions [regarding nicotine manipulation] to her injuries, other than the suggestion that it caused her to smoke more cigarettes." (Reply at 5.) Defendants are correct that Plaintiff's evidence suggests that Defendants' products failed to meet consumer expectations and thereby caused her to smoke more cigarettes. However, Defendants incorrectly argue that Plaintiff fails to introduce evidence of causation linking Defendants' conduct to Plaintiff's injuries. Plaintiff's evidence shows that cigarette smoke contains chemicals that increase the probability of being affected by periodontal disease and Chronic Obstructive Pulmonary Disease. (Farone Depos., at 41–43; Pl. UF 51.) Nicotine-addicted smokers and smokers of "light" cigarettes consume more cigarette smoke and thus are exposed to more of these harmful chemicals. (*See id.*; Pl. UF 60.) Plaintiff, by suggesting that ordinary consumers were unaware of cigarettes' enhanced addictiveness or of "light" cigarettes' reduced nicotine, has raised a triable issue as to whether Defendants' products were defective in design under the consumer expectations test.

Accordingly, Plaintiff has established a triable issue as to whether Defendants' product failed to meet consumer expectations and whether this defect contributed to Plaintiff's injuries.

**2. Whether Restatement (Second) of Torts, § 402A (comment i) Bars Plaintiff's Product Liability Claims**

Cal. Civ.Code § 1714.45(a) establishes an affirmative defense from products liability for product manufacturers or sellers. A manufacturer or seller is not liable for personal injuries if the product is "inherently unsafe," is "known to be unsafe by the ordinary consumer," and is "a common consumer product intended for personal consumption." Cal. Civ.Code § 1714.45(a). In defining "common consumer product intended for personal consumption," the statute references Restatement (Second) of Torts, § 402A (comment i). *Id.* at § 1714.45(a)(2).

The statute's reference to comment i reflects the fact that California common law differs from Restatement § 402A. As Defendants acknowledge, "comment i was codified in California Civil Code section 1714.45." (Defs.' Mem. at 9.) However, Defendants fail to note that, outside the purview of § 1714.45, California common law clearly departs from Restatement § 402A comment i. In fact, in *Cronin v. J.B.E. Olson Corp.*, 8 Cal.3d 121, 131–33, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972),

the California Supreme Court explicitly disavowed the exact formulations of Restatement § 402A, including the affirmative defense contained in Restatement § 402A comment i. To the extent that § 402A and comment i are part of California law, it is *solely* by operation of Cal. Civ.Code § 1714.45. *See also* Cal. Civ.Code § 1714.45(d) (reaffirming *Cronin* and "existing California law").

In fact, *twenty years ago* the California Court of Appeal established that Defendants' current argument is meritless:

> Under the law existing prior to the enactment of section 1714.45 cigarette manufacturers could be held liable for damages resulting from the use of cigarettes if the plaintiff proved that a defect in the cigarette's manufacture or design proximately caused their injury. A defect could be shown by evidence that (a) the product "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner" or (b) the product's design embodied " 'excessive preventable danger.' "

*American Tobacco Co. v. Superior Court,* 208 Cal.App.3d 480, 489 n. 3, 255 Cal.Rptr. 280 (1989) (quoting *Cronin,* 8 Cal.3d at 133, 104 Cal.Rptr. 433, 501 P.2d 1153; *Barker,* 20 Cal.3d at 426–27, 430, 143 Cal. Rptr. 225, 573 P.2d 443). It is telling that the *American Tobacco* court's discussion of pre- § 1714.45 law does not mention any affirmative defenses such as comment i. In the California courts' view, the basic "design defect" causes of action (discussed *supra*) are the sole tests for determining design defect liability. These tests simply do not include any affirmative defenses such as the standard expressed in comment i.

Yet despite the clear holding of *Cronin* and subsequent cases, Defendants argue

that "section 402A of the *Restatement,* which includes comment i, was generally endorsed by the California Supreme Court." (Defs.' Mem., at 9 n. 5.) An examination of *Cronin* reveals that Defendants' argument is plainly incorrect. Defendants do not cite any California Supreme Court statement containing a "general endorsement" of Restatement § 402A. It is particularly telling that Defendants are unable to cite *a single California case* applying Restatement § 402A comment i outside the context of § 1714.45's statutory enactment of Restatement § 402A. (*See generally* Defs.' Mem. at 8–10 & n. 6).

With these basic principles in mind, Defendants' attempted reliance on Restatement § 402A comment i is easily refuted. As currently codified, Cal. Civ.Code § 1714.45 explicitly prevents application comment i to tobacco manufacturers such as Defendants. Section 1714.45(b) clearly states that "[t]his section [§ 1714.45] does not exempt the manufacture or sale of tobacco products by tobacco manufacturers and their successors in interest from product liability actions." Cal. Civ.Code § 1714.45(b). In fact, the Legislature has clearly codified its intent that tobacco-related tort claims "shall be determined on their merits, without the imposition of any claim of statutory bar or categorical defense." Cal. Civ.Code § 1714.45(f); *see also Boeken,* 127 Cal.App.4th at 1670, 26 Cal.Rptr.3d 638 ("[E]xcept for the limited ten-year period [during which § 1714.45 applied to tobacco manufacturers], Philip Morris was not entitled to have the jury instructed with BAJI No. 9.00.6 [regarding the affirmative defense contained in § 1714.45(a) and Restatement § 402A comment i]." Defendants' arguments regarding comment i clearly fail as a matter of law.[16]

---

**16.** Even if Defendants were entitled to rely on the affirmative defense contained in § 402A

## B. FRAUDULENT CONCEALMENT

Plaintiff's Fourth Cause of Action asserts that Defendants fraudulently concealed material information from Plaintiff relating to the health effects of smoking. Plaintiff asserts that she would not have smoked had she known that she risked acquiring Chronic Obstructive Pulmonary Disease and periodontal disease. Defendants seek summary judgment in two parts: first, for Defendants' actions prior to July 1969, that Plaintiff fails to establish a prima facie case of fraudulent concealment; and second, for Defendants' actions after July 1969, that Plaintiff fraudulent concealment claims are preempted by the Cigarette Labeling Act.

### 1. Pre–July 1969

■ Under California law, "[t]here are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.' " *OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 157 Cal.App.4th 835, 859, 68 Cal.

comment i, Plaintiff has established a genuine issue as to whether the risk of periodontal disease was commonly known to be an inherent risk of smoking. *See* Restatement § 402A (comment i) (permitting liability if a product is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics"); *American Tobacco*, 208 Cal.App.3d at 489 n. 5, 255 Cal.Rptr. 280 ("Evidence that the risks are greater than those anticipated [by the ordinary consumer] ... could possibly be used to support a claim that the product is defective under the standards outlined in *Barker*.").

Rptr.3d 828 (2007) (quoting *LiMandri v. Judkins*, 52 Cal.App.4th 326, 336, 60 Cal. Rptr.2d 539 (1997)).

■ The first situation cannot be met here. Commercial, arms-length relationships are not fiduciary relationships. *See Committee on Children's Television v. General Foods Corp.*, 35 Cal.3d 197, 221–22, 197 Cal.Rptr. 783, 673 P.2d 660 (1983). Plaintiff has not identified any evidence on the record that suggests that the parties were in fiduciary relationships. Instead, Plaintiff has chosen to use its Opposition to "explain[ ] only one circumstance giving rise to a fraud claim based on fraudulent concealment." (Pl.'s Opp. at 22–23 n. 21.) Plaintiff has focused on the fiduciary relationship claim—the one claim that is least supportable in the present circumstances. Buyers and sellers are simply not fiduciaries.

■ On the hand, the second through fourth situations may potentially apply in this case because "a vendor has a duty to disclose material facts not only to immediate purchasers, but also to *subsequent purchasers* when the vendor has reason to expect that the item will be resold." *OCM*, 157 Cal.App.4th at 859, 68 Cal. Rptr.3d 828 (emphasis in original). Applied to the present case, this rule establishes that Defendants may have owed

However, to the extent that Plaintiff seeks to impose liability for Defendants' conduct during the period when Cal. Civ.Code § 1714.45(a) applied to tobacco products, Plaintiff's claims may fail as a matter of law. *See Myers v. Philip Morris Cos., Inc.*, 28 Cal.4th 828, 840, 123 Cal.Rptr.2d 40, 50 P.3d 751 (2002) ("[W]hile the Immunity Statute was in effect—from January 1, 1988, through December 31, 1997—no tortious liability attached to a tobacco company's production and distribution of pure and unadulterated tobacco products to smokers.").

Plaintiff a duty to disclose material facts related to Plaintiff's purchase of Defendants' products. However, Defendants correctly note that Plaintiff has the burden of identifying evidence supporting a prima facie case of fraud under these three remaining fraud theories.

In large part, Plaintiff merely asserts that "Grisham's FAC, Statement of Disputed Facts, and Exhibits attached to this Opposition substantially and extensively support all four circumstances." (*Id.* at 22–23 n. 21.) Plaintiff is misguided in its apparent belief that it can defeat summary judgment through a conclusory reference to its voluminous submissions. *See Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1029 (9th Cir.2001) (court need not "comb the record" looking for evidence to establish a party's contentions on summary judgment).

■■■ However, other sections of Plaintiff's Opposition sufficiently identify facts that may support one of these causes of action. Plaintiff avoids summary judgment on the fourth and final theory of fraud: "when the defendant makes partial representations but also suppresses some material facts." *OCM*, 157 Cal.App.4th at 859, 68 Cal.Rptr.3d 828. As explained by another court, "where one who is under no duty to speak nevertheless does so . . . he is bound to speak honestly, and not to suppress facts which materially qualify those stated." *Nibbi Brothers, Inc. v. Home Federal Sav. & Loan Assn.*, 205 Cal.App.3d 1415, 1425, 253 Cal.Rptr. 289 (1988) (internal quotations omitted). As is explained *infra* with respect to Plaintiff's express warranty cause of action, Defendants' involvement in publishing the 1954 document entitled "Frank Statement About Health Effects of Smoking" may have given rise to a duty that Defendants to "speak honestly" about facts that were material to downstream consumers such as Plaintiff. *See Nibbi Brothers*, 205 Cal. App.3d at 1425, 253 Cal.Rptr. 289.

On the other hand, Plaintiff has not identified any evidence supporting the second or third theories of fraud. The second fraud theory requires that "defendant had exclusive knowledge of material facts not known to the plaintiff." *Id.* Plaintiff has not identified any evidence suggesting that Defendants had *exclusive* knowledge of health risks related to periodontal disease and Chronic Obstructive Pulmonary Disease. Defendants are entitled to summary judgment on this theory. *See Carmen*, 237 F.3d at 1029 (court need not "comb the record" looking for evidence to establish a party's contentions on summary judgment).

The third fraud theory requires that "the defendant actively conceals a material fact from the plaintiff." *OCM*, 157 Cal. App.4th at 859, 68 Cal.Rptr.3d 828. Again, Plaintiff has not identified any evidence showing that Defendants *actively concealed* material information *from Plaintiff.* Plaintiff's Opposition does not refer to any evidence on this point. Defendants are entitled to summary judgment on this theory of fraud liability. *See Carmen*, 237 F.3d at 1029.

Accordingly, Plaintiff has established a genuine issue of material fact sufficient to defeat Defendant's Motion for Summary Judgment as it relates to fraudulent concealment claims (under a "partial representations" theory) for Defendants' pre-July 1969 actions.[17]

### 2. Post–July 1969

■■■ Defendants also challenge Plaintiff's fraudulent concealment claims on the basis that claims arising from Defendants' post-July 1, 1969 conduct are preempted

---

17. Defendants have not challenged Plaintiff's false representation claims contained in the

Fourth Cause of Action. (*See* Defs.' Mem. at 12–14.)

by the Cigarette Labeling Act. According to Defendants, this cause of action ultimately rests on the adequacy of the warning label on cigarette packages, and that warning labels are governed exclusively by federal law. Plaintiff responds that preemption does not apply to fraud-based claims, and fraudulent concealment is ultimately based in fraud rather than failure-to-warn about the health risks of smoking.

The Cigarette Labeling Act, 15 U.S.C. § 1334(b), establishes that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." The Supreme Court's plurality opinion in *Cipollone*, recently reaffirmed in *Altria Group, Inc. v. Good*, ── U.S. ──, 129 S.Ct. 538, 545–47, 172 L.Ed.2d 398 (2008), clearly stated that § 1334(b) only preempts state-law claims where the "legal duty that is the predicate of the common-law damages action constitutes a requirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertising or promotion." *Cipollone*, 505 U.S. at 524, 112 S.Ct. 2608. The Supreme Court has accordingly held that state-law fraud-based duties not to deceive are not preempted, as such duties not to deceive "ha[ve] nothing to do with smoking and health." *Altria*, 129 S.Ct. at 545. Fraud-based claims involve legal rights and duties that are unrelated to the Cigarette Labeling Act, which is strictly concerned with smoking and health. *See also Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1148 (9th Cir.2005) (determining non-preemption of Nevada failure-to-warn law where state-law duties could have been met "through means other than advertising and promotion"). Thus, a fraudulent concealment cause of action is not necessarily preempted by § 1334(b).

### 3. Summary

Accordingly, Defendants fail to establish that they are entitled to summary judgment on Plaintiff's fraudulent concealment claims.

### C. EXPRESS WARRANTY

Plaintiff's Sixth Cause of Action asserts that Defendants' advertisements suggested that smoking was safe and, in particular, that low-tar or "light" cigarettes were safer than ordinary cigarettes. The dispute here is whether Defendants' representations and advertisements expressly warranted to Plaintiff that cigarettes are safe and that smoking does not cause periodontal disease or Chronic Obstructive Pulmonary Disease.

The basic requirements of a breach of express warranty claim are set out in Cal. Com.Code § 2313(1):

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

. . . . .

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Plaintiff properly asserts that this statute does not require plaintiffs to establish reliance. *See Hauter v. Zogarts,* 14 Cal.3d 104, 115, 120 Cal.Rptr. 681, 534 P.2d 377 (1975). However, the statute does require that plaintiffs identify particular "affirmations of fact." Cal. Com.Code § 2313(1)(a); *see also Hauter,* 14 Cal.3d at 115, 120 Cal.Rptr. 681, 534 P.2d 377 (citing U.C.C. § 2313 (comment 3)).

A Ninth Circuit case is particularly helpful in understanding the nature of an "affirmation of fact." In *Maneely v. General Motors Corp.,* 108 F.3d 1176, 1181 (9th Cir.1997), the court discussed a series of "print and television advertising showing young people standing or sitting in the cargo beds of pickup trucks." The court explained that such advertisements merely "present visual images of the product set in certain surroundings and make no explicit guarantees," and thus as a matter of law cannot "constitute[ ] a representation of fact and a promise by GMC that riding in the cargo bed is safe." *Id.*

▇ The *Maneely* court distinguished the truck ads from situations where courts had found that express warranties had been made. For example, in *Hauter,* the California Supreme Court examined a warranty surrounding a golf training device in which the "the label on the shipping carton and the cover of the instruction booklet ... state: 'COMPLETELY SAFE BALL WILL NOT HIT PLAYER.'" 14 Cal.3d at 109, 120 Cal.Rptr. 681, 534 P.2d 377. In *Keith v. Buchanan,* 173 Cal.App.3d 13, 18, 22, 220 Cal.Rptr. 392 (1985), the California Court of Appeal discussed yacht sales literature describing the product as "a picture of sure-footed seaworthiness" and "a carefully well-equipped, and very seaworthy live-aboard vessel." Quite obviously, *Hauter* and *Keith* involved "affirmations of fact" under § 2313. In general, then, for a seller's statement to constitute a warranty of the product's safety or healthiness, that

statement must clearly and directly refer to the product's safety or healthiness.

Here, Plaintiff does not identify any ads containing an express warranty of safety or healthiness. The ads say things like smoking "is a good idea," or it is "so smart to smoke." (Defs. UF 32, 34.) These statement are silent as to health or safety. No reasonable juror could interpret these statements as expressly warranting that smoking is safe and healthy. Even if the Court examines "the accumulation of all the ads ... which have the effect of building impression[s], attitudes, and opinions about smoking," (Pl.'s Opp. at 26), it is clear that the advertisements say nothing whatsoever about health and safety. "[I]mpression[s], attitudes, and opinions" are different from explicit "affirmations of fact."

Other ads involve statements about "low tar," in particular that a cigarette "delivers" lower tar or is "lowest in 'tar' and nicotine" of comparable cigarettes. (Pl. CF 63, 68; Phares Decl., Ex. 9: 7, 29.) Almost all of these ads refer to the *flavor,* not *safety,* of lower-tar cigarettes. (*See generally, e.g.,* Pl.'s Ex. 15.) None of these ads asserts that smoking lower tar cigarettes is safer or healthier than ordinary cigarettes, and Plaintiff does not point to any other representations by Defendants suggesting that lower tar is safer. No reasonable juror could read these advertisements as containing an express warranty of low-tar cigarettes' health or safety.

▇ The express warranty claim cannot be entirely eliminated, though, because there is a factual question regarding the 1954 publication "A Frank Statement to Cigarette Smokers." (Phares Decl., Pl.'s Ex. 19.) The factual question is whether Plaintiff read the "Frank Statement to Cigarette Smokers," and if so, what Plaintiff understood it to mean. (Pl. CF 25;

Defs. UF 42.) This is important because the "Frank Statement to Cigarette Smokers" may possibly be read as Defendants' affirmative warranty that cigarette-smoking is safe, or that Defendants would update the smoking public about new developments regarding the health effects of smoking. Defendants' failure to provide such updated information may have constituted a breach of warranty if such updated information was part of the basis of the bargain.

Plaintiff states that she was five when the "Frank Statement to Cigarette Smokers" was published. Though she does not claim to have read it when she was five, she states:

> Later in the 60s when I was a teenager, I believe that I read the 'Frank Statement.' I was uncertain about and did not fully understand the message the 'Frank Statement' was sending. I continued to believe in a general way that genetically predisposed individuals who smoked might develop cancer or heart disease, but I didn't think every body who smoked and had a genetic predisposition would get these diseases.

(Pl. Ex. 9 to Statute of Limitations Motion, ¶ 23, at 6.)

Because there is conflicting and unclear evidence, this issue cannot easily be resolved on summary judgment. Plaintiff has stated that she might have read the "Frank Statement to Cigarette Smokers," but that she was only five years old at the time it was released and is not sure whether she read it and understood what it meant. So, while it may be unlikely that the "Frank Statement to Cigarette Smokers" will ultimately support liability on express warranty grounds, the Court cannot hold as a matter of law that there is no evidence on the record to support this portion of Plaintiff's claim.

## VI. CONCLUSION

For the foregoing reasons, the Court ORDERS the following:

1) Defendants' Motion for Summary Judgment on the Statute of Limitations Defense is DENIED.

2) Plaintiff's Motion to Stay Case and Request for Collateral Estoppel is DENIED.

3) Defendants' Motion for Summary Judgment on the First, Second, Fourth, and Sixth Causes of Action is GRANTED IN PART and DENIED IN PART in the following manner:

A) Defendants' Motion for Summary Judgment on Plaintiff's First and Second Causes of Action is DENIED;

B) Defendants' Motion for Summary Judgment on Plaintiff's Fourth Cause of Action is DENIED with respect to Plaintiff's "partial representations" theory of fraud based on Defendants' pre-July 1969 conduct, GRANTED with respect to Plaintiff's remaining theories of fraud based on Defendants' pre-July 1969 conduct, and DENIED with respect to all of Defendants' post–1969 conduct;

C) Defendants' Motion for Summary Judgment on Plaintiff's Sixth Cause of Action is DENIED with respect to the warranty potentially contained in the 1954 publication "A Frank Statement to Cigarette Smokers," and GRANTED with respect to Plaintiff's remaining theories of breach of warranty.

The Court further ORDERS the parties to address the following questions regarding how to proceed with determining the application of the statute of limitations:

1) Whether, in light of the Seventh Amendment, the factual issues surrounding the statute of limitations (including delayed discovery and equitable tolling) must be determined by a jury.[18]

---

18. The parties may find some assistance on

this question in *Owens v. White*, 380 F.2d 310,

2) If the Seventh Amendment requires these factual issues to be determined by a jury, whether the values of justice and efficiency, *see* Fed.R.Civ.P. 1, would be better served by bifurcating trial so that the factual issues surrounding the statute of limitations will be determined separately from the factual issues surrounding Defendants' liability.

3) If the Seventh Amendment does not require these to be determined by a jury, whether the values of efficiency and justice would be better served by bifurcating trial, and whether these factual issues should be determined by the Court or by the jury.

The parties must concurrently file opening briefs of no more than fifteen pages by Monday, October 26, 2009, and response briefs of no more than eight pages by Monday, November 2, 2009. The Court will hold a hearing on the matter on Monday, November 9, 2009 at 1:30 p.m.

In light of this new briefing schedule, the Court CONTINUES the current pretrial and trial schedule so that the Local Rule 16–2 meeting of counsel will take place thirty days after the Court decides how to proceed with determining the application of the statute of limitations.

Following this determination, the Court will address the parties' stipulation to continue pretrial and trial dates pending the California Supreme Court's decision in *Pooshs v. Phillip Morris USA, Inc.*

IT IS SO ORDERED.

313 & n. 2 (9th Cir.1967) and *Bank of America National Trust & Savings Ass'n v. Greenbach*, 98 Cal.App.2d 220, 229–31, 219 P.2d 814 (1950), though these cases are not particularly systematic in their discussion of this point. The parties should be aware that many cases include dicta suggesting that the "jury" or the "factfinder" must determines the relevant facts; the Court is familiar with these cases, but is interested in finding a clear discussion of the Constitutional *requirements* on this point.