Diann SHAFFER, Plaintiff,

v.

R.J. REYNOLDS TOBACCO COM-
PANY, Reynolds American,
Inc., Defendants.

No. CV 09–649–TUC–FRZ.

United States District Court,
D. Arizona.

April 26, 2012.

Austin Tighe, Feazell & Tighe LLP, Christopher Robert Johnson, Michael Bryan Angelovich, Nix Patterson & Roach LLP, Austin, TX, Brad E. Seidel, Nix Patterson & Roach LLP, Daingerfield, TX, Bruce G. MacDonald, Sue Ann A. Welch, McNamara Goldsmith & MacDonald PC, Tucson, AZ, for Plaintiff.

Brian Michael Goodwin, Melissa S. Ho, Polsinelli Shughart PC, Phoenix, AZ, Theodore M. Grossman, Jones Day, Cleveland, OH, Todd R. Geremia, Jones Day, New York, NY, for Defendants.

## ORDER

FRANK R. ZAPATA, District Judge.

Pending before the Court is Plaintiff's motion for partial summary judgment whereby Plaintiff urges the Court to apply offensive nonmutual issue preclusion (also known as collateral estoppel) to prevent Defendants' from disputing liability in this case. Plaintiff's motion is denied.

### Background

#### Plaintiff's Allegations

This case is a putative class action on behalf of Arizona consumers who were defrauded by R.J. Reynolds Tobacco Company and Reynolds American Incorporated (hereinafter, collectively referred to as "RJR" or "Defendants"). Plaintiff alleges that RJR defrauded consumers in the marketing and sale of cigarettes packaged and advertised as "Light" or "Ultra–Light" inasmuch as these products were falsely represented as lower in tar and nicotine as compared to regular (i.e., non-light) cigarettes. Although RJR marketed these light cigarettes as a healthier alternative to regular cigarettes as consumers would purportedly inhale less tar and nicotine, RJR knew these representations were false as most consumers would ultimately inhale equal or greater amounts of tar and nicotine in their use of light cigarettes. For example, RJR knew that consumers smoked cigarettes to maintain their nicotine addition, and as such, smokers of light cigarettes compensated to maintain prior nicotine levels by simply increasing "intake through larger or more frequent puffs, holding smoke in their lungs longer, and/or subconsciously adjusting the puff volume and frequency and smoking frequency, so as to obtain and maintain's [one's] previous per hour and per day requirement for nicotine." *See* Complaint at ¶ 38. In addition, the "lower tar and nicotine levels used by Defendants to promote Light Cigarettes were the results of smoking machine tests that do not accurately report how much tar and nicotine is delivered to a smoker. Light Cigarettes, by virtue of their design, result in understated and misleading results because (i) their pinhole vents are commonly covered in use but not in machine testing, which causes the machines to measure artificially low tar and nicotine levels; (ii) the increased length of the paper wrap covering the outside of the cigarette filter … decreases the number of draws and tobacco burned during the machine test and thus causes lower tar and nicotine levels than are available to the smoker; and (iii) the machine tests fail to account for the craving for nicotine and smoker compensation, which results in more inhalation of tar, nicotine, and other harmful chemicals in actual use." *See id.* at ¶ 39. Furthermore, increased ventilation (as compared to regular cigarettes) increases the mutagenicity of cigarette smoke. Despite this knowledge that light

cigarettes were just as harmful regular cigarettes, RJR purposely misled consumers into thinking that they were healthier to counteract concerns about the health effects of smoking, to induce smokers not to quit smoking, and to otherwise sustain corporate revenues.

Based on these allegations, Plaintiff asserts causes of action under Arizona law for: (1) violation of the Arizona Consumer Fraud Act (A.R.S. § 44–1521 *et seq.*); (2) concealment; (3) nondisclosure; (4) negligent misrepresentation; and (5) unjust enrichment. Plaintiff requests certification of a class of Arizona consumers who were defrauded by RJR as discussed herein, and seeks an award of compensatory, restitutionary, and punitive damages on behalf of the class ("but excluding damages for personal injury or health care claims"). *See id.* at p. 15, ¶ B.

*The DOJ Case*

As pertinent to the motion before the Court, Plaintiff seeks to establish liability as to all of Plaintiff's claims against RJR based on giving preclusive effect to 749 findings of facts (out of 4,088 total findings of fact) issued in 2006 by one U.S. District Judge during a bench trial for purely equitable relief in the District of Columbia. *See U.S. v. Philip Morris USA, Inc.,* 449 F.Supp.2d 1 (D.D.C.2006), *aff'd in part, vacated in part,* 566 F.3d 1095 (D.C.Cir. 2009) (hereinafter cited and referred to as "DOJ" or "DOJ Case"). The court in the DOJ Case summarized the litigation as follows:

> On September 22, 1999, the United States brought this massive lawsuit against nine cigarette manufacturers of cigarettes and two tobacco-related trade organizations. The Government alleged that Defendants have violated, and continue to violate, the Racketeer Influenced and Corrupt Organizations Act ("RICO") ... by engaging in a lengthy, unlawful conspiracy to deceive the American public about the health effects of smoking and environmental tobacco smoke, the addictiveness of nicotine, the health benefits from low tar, "light" cigarettes, and their manipulation of the design and composition of cigarettes in order to sustain nicotine addiction ... In particular, the Government has argued that, for approximately fifty years, the Defendants have falsely and fraudulently denied: (1) that smoking causes lung cancer and emphysema (also known as chronic obstructive pulmonary disease ("COPD")), as well as many other types of cancer; (2) that environmental tobacco smoke causes lung cancer and endangers the respiratory and auditory systems of children; (3) that nicotine is a highly addictive drug which they manipulated in order to sustain addiction; (4) that they marketed and promoted low tar/light cigarettes as less harmful when in fact they were not; (5) that they intentionally marketed to young people under the age of twenty-one and denied doing so; and (6) that they concealed evidence, destroyed documents, and abused the attorney-client privilege to prevent the public from knowing about the dangers of smoking and to protect the industry from adverse litigation results ... The following voluminous Findings of Fact demonstrate that there is overwhelming evidence to support most of the Government's allegations. As the Conclusions of Law explain in great detail, the Government has established that Defendants (1) have conspired together to violate the substantive provisions of RICO ... Accordingly, the Court is entering a Final Judgment and Remedial Order which seeks to prevent and restrain any such violations of RICO in the future ... In particular, the Court is enjoining Defendants from further use of deceptive brand descriptors which implicitly or explicitly convey

to the smoker and potential smoker that they are less hazardous to health than full flavor cigarettes, including the popular descriptors "low tar," "light," "ultra light," "mild," and "natural." The Court is also ordering Defendants to issue corrective statements in major newspapers, on the three leading television networks, on cigarette "onserts," and in retail displays, regarding (1) the adverse health effects of smoking; (2) the addictiveness of smoking? and nicotine; (3) the lack of any significant health benefit from smoking "low tar," "light," "ultra light," "mild," and "natural" cigarettes; (4) Defendants' manipulation of cigarette design and composition to ensure optimum nicotine delivery; and (5) the adverse health effects of exposure to secondhand smoke ... Unfortunately, a number of significant remedies proposed by the Government could not be considered by the Court because of a ruling by the Court of Appeals ... [which] ... held that, because the RICO statute allows only forward-looking remedies to prevent and restrain violations of the Act, and does not allow backward-looking remedies, disgorgement (i.e., forfeiture of ill-gotten gains from past conduct) is not a permissible remedy ... The seven-year history of this extraordinarily complex case involved the exchange of millions of documents, the entry of more than 1,000 Orders, and a trial which lasted approximately nine months with 84 witnesses testifying in open court. Those statistics, and the mountains of paper and millions of dollars of billable lawyer hours they reflect, should not, however, obscure what this case is really about. It is about an industry, and in particular these Defendants, that survives, and profits, from selling a highly addictive product which causes diseases that lead to a staggering number of deaths per year, an immeasurable amount of human suffering and econom-

ic loss, and a profound burden on our national health care system. Defendants have known many of these facts for at least 50 years or more. Despite that knowledge, the have consistently, repeatedly, and with enormous skill and sophistication, denied these facts to the public, to the Government, and to the public health community. Moreover, in order to sustain the economic viability of their companies, Defendants have denied that they marketed and advertised their products to children under the age of eighteen and to young people between the ages of eighteen and twenty-one in order to ensure an adequate supply of "replacement smokers," as older ones fall by the wayside through death, illness, or cessation of smoking. In short, Defendants have marketed and sold their lethal product with zeal, with deception, with a single-minded focus on their financial success, and without regard for the human tragedy or social costs that success exacted ... Finally, a word must be said about the role of lawyers in this fifty-year history of deceiving smokers, potential smokers, and the American public about the hazards of smoking and second hand smoke, and the addictiveness of nicotine. At every stage, lawyers played an absolutely central role in the creation and perpetuation of the Enterprise and the implementation of its fraudulent schemes. They devised and coordinated both national and international strategy; they directed scientists as to what research they should and should not undertake; they vetted scientific research papers and reports as well as public relations materials to ensure that the interests of the Enterprise would be protected; they identified "friendly" scientific witnesses, subsidized them with grants from the Center for Tobacco Research and the Center for Indoor Air Research, paid

them enormous fees, and often hid the relationship between those witnesses and the industry; and they devised and carried out document destruction policies and took shelter behind baseless assertions of the attorney client privilege ... What a sad and disquieting chapter in the history of an honorable and often courageous profession.

*See id.* at 26–29.

### Discussion

#### Offensive Nonmutual Issue Preclusion

■ The Ninth Circuit has summarized the standard regarding offensive nonmutual issue preclusion as follows:

[T]he application of offensive nonmutual issue preclusion ... prevents "a defendant from relitigating the issues which a defendant previously litigated and lost against another plaintiff." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) ... In *Parklane Hosiery,* the Supreme Court sanctioned the use of offensive nonmutual issue preclusion and granted to trial courts "broad discretion to determine when it should be applied" ... We have since specified that the application of offensive nonmutual issue preclusion is appropriate only if (1) there was a full and fair opportunity to litigate the identical issue in the prior action ... (2) the issue was actually litigated in the prior action ... (3) the issue was decided in a final judgment ... and (4) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior action ... The Supreme Court's grant of "broad discretion" to trial courts provides those courts the authority to take potential shortcomings or indices of unfairness into account when considering whether to apply offensive nonmutual issue preclusion, even where the above-listed standard prerequisites are met ... The potential shortcomings or indices of unfairness identi-

fied by the Court include whether (1) the plaintiff had the incentive to adopt a wait and see attitude in the hope that the first action by another plaintiff would result in a favorable judgment which might then be used against the losing defendant; (2) the defendant had the incentive to defend the first suit with full vigor, especially when future suits are not foreseeable; (3) one or more judgments entered before the one invoked as preclusive are inconsistent with the latter or each other, suggesting that reliance on a single adverse judgment would be unfair; and, (4) the defendant might be afforded procedural opportunities in the later action that were unavailable in the first and that could readily cause a different result.

*See Syverson v. Int'l Business Machines Corp.,* 472 F.3d 1072, 1078–79 (9th Cir. 2007). Plaintiff has the burden to prove that all of the elements to establish offensive nonmutual issue preclusion have been satisfied. *See Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1050–51 (9th Cir.2008). Courts have recognized that where offensive nonmutual issue preclusion is being urged, "fairness gains special importance," and applicability of the doctrine in any given case is "detailed, difficult, and potentially dangerous." *Jack Faucett Associates, Inc. v. American Tel. and Tel. Co.,* 744 F.2d 118, 124–25 (D.C.Cir.1984). District courts have broad discretion in deciding whether to apply offensive nonmutual collateral estoppel, and a decision not to apply it may only be reversed if the District Court abuses that discretion. *See id.; see also Appling v. State Farm Mut. Auto. Ins. Co.,* 340 F.3d 769, 775 (9th Cir.2003).

*Every Court That Has Been Asked to Apply Offensive Nonmutual Issue Preclusion Pertaining to the DOJ Case Has Refused to Apply the Doctrine*

Courts in six states (Massachusetts, Missouri, Maine, Minnesota, California,

and New York) handling tobacco litigation have been asked by various plaintiffs to use offensive nonmutual issue preclusion to apply hundreds or thousands of the findings of fact from the DOJ Case to establish liability in their respective cases. All of these courts have rejected these requests and exercised their broad discretion not to allow offensive nonmutual issue preclusion relating to the DOJ Case. *See Aspinall v. Philip Morris Companies, Inc.,* No. 98–6002–H, 2012 WL 1063342 (Mass. Sup.Ct. Mar. 13, 2012); *City of St. Louis v. Am. Tobacco Co.,* No. 22982–09652–01, 2010 WL 2917188 (Mo.Cir.Ct. June 2, 2010); *In re Light Cigarettes,* 691 F.Supp.2d 239 (D.Me.2010); *Curtis v. Altria Group,* No. 27–CV–01–18042, slip. Op., 2009 WL 5820516 (Minn.Distr.Ct. Oct. 14, 2009), *aff'd,* 792 N.W.2d 836 (Minn.Ct.App. 2010); *Grisham v. Philip Morris, Inc.,* 670 F.Supp.2d 1014 (C.D.Cal.2009); *Schwab v. Philip Morris USA, Inc.,* 449 F.Supp.2d 992 (E.D.N.Y.2006), *rev'd on other grounds,* 522 F.3d 215 (2nd Cir.2008). Like these courts, this Court finds that using offensive nonmutual issue preclusion to apply findings of fact from the DOJ Case to establish liability in this case is inappropriate, and therefore exercises its broad discretion not to allow the use of the doctrine in this case.

*Inconsistent Cases*

■ The inconsistent cases in this area of tobacco litigation case indicate that it would be unfair to give preclusive effect to the findings in the DOJ Case to establish liability in this case. *See Syverson,* 472 F.3d at 1078–79 ("The potential shortcomings or indices of unfairness identified by the Court include whether ... one or more judgments entered before the one invoked as preclusive are inconsistent with the latter or each other, suggesting that reliance on a single adverse judgment would be unfair."). RJR argues, for example, that it has secured decisions in its favor in at least: 11 cases involving low tar allega-

tions; 22 cases involving allegations relating to adverse health effects of smoking; 19 cases involving allegations relating to nicotine addiction and manipulation; and 19 cases involving suppression of research and destruction of documents. In particular, in contrast to the DOJ bench trial where the court found that liability had been established under RICO stemming from the tobacco defendants' fraudulent conduct, juries in other states have found in favor of RJR on similar federal and state RICO claims. *See Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* No. 98 CV 3287 (E.D.N.Y.) (case alleging federal RICO claims stemming from fraud relating to the marketing and sale of light cigarettes; jury verdict in favor of RJR on the federal RICO claims); *Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris, Inc.,* No. 1:97–CV–1422 (N.D.Ohio) (case alleging state RICO fraud (modeled after the federal RICO statute) relating to light cigarettes; jury verdict in favor RJR on the state RICO fraud claims); *see also Falise v. American Tobacco Co.,* No. 99CV7392 (E.D.N.Y.) (hung jury relating to similar fraud allegations overlapping with this case); *Setter v. A.H. Robins Co.,* 748 F.2d 1328, 1330 (8th Cir.1984) (discussing a hung jury in relation to inconsistent verdicts for purposes of offensive nonmutual issue preclusion).

Four courts have rejected giving preclusive effect to the findings in the DOJ case based, in part, on the fact that there are inconsistent decisions in this area of litigation inasmuch as there are decisions favorable to tobacco defendants related to allegations of fraud in the sale and marketing cigarettes. *See, e.g., Aspinall v. Philip Morris Companies, Inc.,* No. 98–6002–H (Mass.Sup.Ct. Mar. 13, 2012), slip op. at 11 ("*Blue Cross* and *Iron Workers* ... [delivered verdicts] ... finding that the defendants, including Philip Morris, did not engage in the same fraudulent conduct under

RICO that was asserted in the DOJ action. The judgments in both *Blue Cross* and *Iron Workers* are inconsistent with the judgment in the DOJ Action for purposes of offensive collateral estoppel."); *City of St. Louis v. Am. Tobacco Co.*, No. 22982–09652–01, 2010 WL 2917188 (Mo.Cir.Ct. June 2, 2010), slip op. at 8 [1] ("Wholly apart from the countless individual smoker cases that have resulted in defense verdicts that run counter to the *DOJ* conclusions, at least two federal RICO fraud/conspiracy actions [*Blue Cross* and *Iron Workers* ] have resulted in jury verdict outcomes that are directly opposite of the outcome in the court-tried *DOJ* case."); *Schwab v. Philip Morris USA, Inc.*, 449 F.Supp.2d at 1079 ("[D]efendants have won so many of the tobacco cases that applying . . . conclusive effect to the last of the series of litigations is inappropriate."); *Curtis v. Altria Group*, No. 27–CV–01–18042 (Minn.Distr.Ct. Oct. 14, 2009), slip op. at 10 ("Inconsistent with the [DOJ] court's finding of liability on the RICO claim in *DOJ*, the jury in *Blue Cross* rejected the plaintiff's RICO claims . . . [Also] inconsistent with *DOJ*, the jury found in favor of Philip Morris on the state-law RICO claim in [*Iron Workers* ].").[2]

In light of the inconsistent decisions at issue, the Court finds that offensive nonmutual issue preclusion is inappropriate in this case.

*Plaintiff Has Not Shown That The Findings At Issue Were Necessary to the Judgment in the DOJ Case*

█ Plaintiff has not met her burden of showing that the 749 DOJ findings of fact at issue were necessary to the judgment in the DOJ Case. *See Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1115 (9th Cir.1999)("Preclusive force [only] attaches to determinations that were necessary to support the court's judgment in the first action. Litigants conversely are not precluded from relitigating an issue if its determination was merely incidental to the judgment in the prior action."); *Grisham*, 670 F.Supp.2d at 1031 ("The moving party clearly bears the burden of establishing . . . that the issues and facts were essential to the judgment. . . . [N]either the district court nor the defendant is required to engage in a hunt and peck exercise to ferret out potentially relevant and necessary findings . . . In addition to identifying the essential facts, Plaintiff must also establish that these facts meet the legal requirements for each issue as to which it seeks preclusive effect in the later case.")(internal quotes and citations omitted). Other than referencing and string citing approximately 749 findings of fact from the DOJ Case, Plaintiff has not specifically explained how the findings of fact at issue were actually necessary to the final judgment in the case such that preclusion could attach. As such, as Plaintiff has failed to meet her burden on this issue, the Court finds that offensive nonmutual issue preclusion is inappropriate in this case. *See id.; see also In re Light Cigarettes*, 691 F.Supp.2d at 250 (declining to apply offensive nonmutual issue preclusion as plaintiffs failed to specifically show how the 1,083 findings at issue from the DOJ Case were necessary to the judgment);

1. The Westlaw copy of the opinion does not appear to have page numbers in the text of the opinion like most opinions appearing on Westlaw; as such, the Court will simply cite to the relevant page number appearing in the upper corner of the Westlaw document at issue as it corresponds to cited portions of the opinion.

2. While the Court is aware that one court (*Grisham*, 670 F.Supp.2d at 1033–35) did not find that inconsistent decisions was a factor weighing against preclusion as applicable to applying the DOJ's findings, the Court finds the other four decisions on the issue more persuasive as reflected above.

*Grisham,* 670 F.Supp.2d at 1031–32 (declining to apply nonmutual offensive issue preclusion as plaintiff failed to specifically show how the 2,600 findings at issue from the DOJ Case were necessary to the judgment).

*Other Issues Reflecting that Offensive Nonmutual Issue Preclusion is Inappropriate*

In addition to the factors referenced above, the Court also finds that other factors weigh against applying preclusion in this case.

■ Unlike the DOJ case that only involved equitable relief and was tried only to the court in a bench trial, this case involves claims for damages, and in particular, punitive damages which presents special concerns that must be decided by a jury. As such, unlike the DOJ Case, it is undisputed that RJR has a right to a jury trial and has affirmatively asserted its right to a jury trial in this case. The lack of a jury trial in the DOJ Case and special concerns pertaining to damages weighs against applying offensive nonmutual issue preclusion in this case. *See Grisham,* 670 F.Supp.2d at 1036 (finding that a lack of a jury trial weighed against preclusion; stating that "In light of the clear Constitutional interest supporting civil jury trials, *Parklane's* discussion is better understood as establishing that courts are not automatically prohibited from granting issue preclusion on account of the fact that the initial action was decided in a bench trial and the subsequent action allows for a jury trial. Rather, the better view of *Parklane* is that courts, in retaining 'broad discretion' over the decision of whether to allow issue preclusion ... may consider the absence of a jury trial as a non-dispositive factor when balancing the equities of issue preclusion ... Here, in addition to basic concerns about Defendants' interest in having a jury decide the case, Plaintiff's

claim for punitive damages raised additional due process concerns ... [E]ven if Plaintiff had convinced the Court that issue preclusion is prima facie proper under *Parklane's* four necessary elements, the Court believes that procedural fairness considerations would ultimately weigh against allowing issue preclusion in the present case. The Court is wary of depriving Defendants of their Seventh Amendment interest in having a jury decide the factual basis for Plaintiff's claim. The Court is also concerned with protecting Defendants' rights under the Due Process Clause, which require that a jury determine the amount of punitive damages."); *see also In re Light Cigarettes,* 691 F.Supp.2d at 251 ("[A]dditional ... considerations underscore why issue preclusion is inappropriate in this case ... the decision in DOJ was reached through a bench trial whereas the Defendants are entitled to a jury trial in the pending actions. Although *Parklane* found the lack of a jury in the initial action did not bar offensive issue preclusion and was basically neutral, *Parklane* also gave district courts broad discretion over the issue preclusion decision ... The Court follows the lead of other courts that have given weight to the deprivation of a jury trial ... the Court is [also] concerned about the possibility for jury confusion and the lack of efficiency ... Punitive damages may not be used to punish a defendant for injury that it inflicts upon nonparties. If issue preclusion were imposed, however, much of the Defendants' underlying liability would be based in part on actions that inflicted injuries upon nonparties. Despite instructions to compartmentalize certain factual findings, the jury could be confused about what facts may or may not be considered when determining punitive damages.")(internal quotes and citations omitted).

Upon review of the record and consideration of the applicable factors as discussed herein,[3] the Court exercises its broad discretion to find that offensive nonmutual issue preclusion is inappropriate under the circumstances of this case and declines to apply the doctrine.

*Conclusion*

Accordingly, IT IS HEREBY ORDERED as follows:

(1) Plaintiff's motion for partial summary judgment seeking to apply offensive nonmutual issue preclusion is denied.[4]

---

**3.** As it is unnecessary to reach a decision, the Court declines to specifically address all of the factors regarding the applicability of the doctrine.

**4.** The Court notes that Plaintiff did not comply with the Court's Local Rules pertaining to page limits and the statement of facts; in the future, failure to comply with the Court's Local Rules may result in summarily denying Plaintiff's motions, or summarily granting Defendants' motions.